## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00942-SCT

*ILLINOIS CENTRAL RAILROAD COMPANY*

*v.*

*WILLIAM R. GANDY*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/03/97 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HAROLD W. McLEARY, JR. |
| | JAMES E. UPSHAW |
| | GLENN F. BECKHAM |
| | GARY K. SMITH |
| ATTORNEYS FOR APPELLEE: | RALPH L. HOLLAND |
| | FRANK O. BURGE, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 11/04/1999 |
| MOTION FOR REHEARING FILED: | 11/17/99; denied 2/3/2000 |
| MANDATE ISSUED: | 2/10/2000 |

## EN BANC.

## McRAE, JUSTICE, FOR THE COURT:

¶1. William R. Gandy, a conductor for the Illinois Central Railroad, was diagnosed with post-traumatic stress syndrome as the result of his experiences during the fatal collision and derailment of two Illinois Central Railroad trains near Flora, Mississippi, on February 26, 1994. Although the physical injuries he sustained healed quickly, Gandy continues to suffer debilitating psychological symptoms, diagnosed as post-traumatic stress disorder, which have prevented him from returning to work as a conductor or trainman. A jury of the Marshall County Circuit Court awarded Gandy FELA damages in the amount of $750,000. Finding no error in any of the issues raised by Illinois Central, we affirm the judgment of the court below.

I.

¶2. On February 26, 1994, two Illinois Central Railroad freight trains collided outside of Flora, Mississippi, resulting in the derailment of both trains. William Gandy was the conductor on the southbound Memphis to Jackson train. As the southbound train entered a curve, the train's engineer, Q.B. Gray, yelled, "Bill!" and threw the train's emergency brake. A northbound train that was not supposed to be there was heading rapidly toward them. Before the trains collided, Gandy jumped to the outside of curve. He recalled that as the trains crashed:

I started crawling. Then, I heard giant sounds to my left. It was cars going upon the air and landing on top of each other, and they were heading me off, and I'm crawling this way, and they're coming in, and I seen a -- looked like a tractor track that had water in it, clean water. I could see that back there. I headed for that. I thought if I could get in that, it wouldn't squash me because I knew they were coming.

He could not move one of his arms, but he got up and looked for other survivors. He first found Jerry Plunk, engineer of the northbound train, who "was in terrible shape" and died later that night, and then, his engineer, Q.B. Gray, and Royce Crowley, conductor of the northbound train, who was unconscious. He stayed with Plunk, who was going into shock. Thousands of gallons of fuel oil and battery acid were pouring out everywhere, and he thought they would be burned.

¶3. Gandy's shoulder was crushed, and his lower back was sprained. At trial, he acknowledged that his back and shoulder were much better, but that weather bothered him and he had to be careful about the way he lifted things. His main problem, he testified, was psychological. Since the accident, he has been unable to get on a locomotive and the smell of diesel fuel terrified him. During efforts to desensitize him, when he got close to a locomotive, "[m]y stomach would get wheezy, and my face would get flushed, and things would get brighter, kind of like you turn the lights up."[1]

¶4. Gandy initially started seeing Dr. Stephen Bell, a psychologist at the Methodist Family Counseling Center in Memphis, shortly after the accident. He was referred to Dr. Bell by the Methodist Outreach DUI Program, where he was sent by the Railroad when trace amounts of THC showed up in a urine sample taken at the hospital on February 26, 1994. Dr. Bell diagnosed Gandy as suffering from post-traumatic stress disorder, chronic type, a condition described by the psychologist as arising from a life-threatening experience, causing fear, anxiety and depression. Dr. Bell further testified that post-traumatic stress disorder arising in the employment context is generally the most severe. He noted that Gandy's situation is exacerbated by a "near miss" he experienced in 1969, when Gandy "laid off," railroad parlance for taking the day off at the last minute, and the train on which he was scheduled to work was involved in a head-on collision, killing all but one of the crew members. When an individual has suffered two similar life-threatening events, he must also deal with the sense of foreboding that there might be a third strike.

¶5. Dr. Bell expressed concern that Gandy had continued to exhibit symptoms of post-traumatic stress disorder more than a three months after the accident. He indicated, however, that his mood was better, and that he was better able to talk about the event. Nevertheless, he did not think that Gandy could go back to work as a conductor at any time in the foreseeable future, reiterating on cross-examination that it was "difficult to predict how long, if ever, he will be able to go back as a conductor."

¶6. At the railroad's request, Gandy also saw Dr. Mel Golden, a Memphis psychiatrist. Dr. Golden also diagnosed Gandy as suffering from post-traumatic stress syndrome and prescribed Prozac for him. Dr. Golden was not called to testify.

¶7. Gandy went to work for the railroad as an apprentice in January, 1967. He received a four-year suspension in 1971 for violation of Rule G4, avoiding any serious violation of the law, after he entered a plea of guilty to drug charges. After returning, he worked his way up through the seniority system and was a conductor at the time of the accident, earning $59,646 in 1993, his last full year of working for the Railroad. He did return to work after the accident, working temporarily as a non-union flagman and yardmaster. The railroad had offered him a job as a conductor, but there were no non-conductor jobs in his seniority district

which would not require getting on a train. As Gandy testified, railroad employment is predicated upon a rather complex seniority system as well as strictly-defined union job classifications.

¶8. Dr. Fred Johnson, an economist, testified on behalf of Gandy concerning future lost earnings. The railroad did not offer its own expert. Gandy was born December 26, 1948, which, based on U.S. Department of Labor tables, gave him a work life expectancy, at the time of trial, of 10.9 years. Using Gandy's 1993 tax return as a base, which showed earnings of $59,646, Johnson calculated the present value of those earnings, factoring in work life, tax consequences of his earnings, employer-related expenses such as union dues, and real wage gain (actual wage increases as adjusted for inflation). Thus, he calculated the present value of Gandy's net income for 1993 at $50,760, with the present value of future railroad earnings over a 10.9 year period calculated at $544,057. Based on the wages of $6.50 an hour Gandy was earning as a security guard at the time of trial, Dr. Johnston calculated the present value of those earnings at $143,772. Subtracting the smaller number, Dr. Johnson arrived at a lost income stream of $400,285. He further calculated the present value of lost health insurance benefits at $59,519.

II.

¶9. On December 6, 1994, Gandy filed his complaint against the Illinois Central Railroad in the Marshall County Circuit Court pursuant to 45 U.S.C. §§ 51 et seq., the Federal Employers' Liability Act (FELA). He alleged that the Railroad had been negligent and sought damages for past and future lost wages and earning capacity; past and future lost medical insurance coverage and contributions by the Railroad to his United States Railroad Retirement plan; and past and future mental anguish and physical pain.

¶10. The Railroad initially denied Gandy's allegations of negligence. Ultimately, on the eve of trial, the Railroad answered Gandy's amended complaint, admitting vicarious liability on the negligence issue by virtue of *respondeat superior*. Thus, trial was limited to the issue of damages.

¶11. A jury trial was held March 24-26, 1997. The jury assessed Gandy's damages at $750,000. Final judgment was entered on April 3, 1997. The Railroad filed a motion for new trial, further seeking a remittitur in one of its amendments thereto. The circuit court denied the Railroad's motions.

III.

¶12. Liability was not at issue in this trial, nor was it ever alleged that Gandy was responsible in any way for the accident. The Railroad, however, contends that the circuit court erred in not admitting evidence it claims is probative of Gandy's "continued drug use." Although totally unsupported by the record, the Railroad appears to now assert that Gandy's alleged drug use is the cause of his inability to return to work, not the post-traumatic stress disorder with which he has been diagnosed.

¶13. Gandy entered guilty pleas to misdemeanor charges of marijuana and LSD possession in 1971 and 1972. Consequently, he was suspended from the Railroad for four years for violating the railroad's policy against breaking serious laws. More than twenty years later, a trace amount of THC was found in Gandy's urine after the accident, despite negative blood tests. The Railroad now asserts that what it characterizes as Gandy's "continuing marijuana use" has had an adverse effect on his psychological well-being which should be a matter of common sense or a matter for judicial notice. Relying on several treatises not made part of the record which note the prevalence of substance abuse amongst those suffering from post-traumatic stress disorder, the Railroad contends that the circuit court should have allowed cross-examination of Gandy and

Dr. Bell regarding Gandy's drug-related arrests and convictions, his drug-related suspensions from work and his credibility because "the jury should have been allowed to hear that Gandy had used illegal drugs, continues to use illegal drugs, and thereby infer that he simply no longer wanted the lifestyle of a railroad trainman rather than suffering from PTSD."

¶14. The circuit court ruled that admission of Gandy's drug charges and related job suspension in the early 1970s would be more prejudicial than probative. Admission of evidence is within the discretion of the trial court and will be reversed only where there is an abuse of that discretion. *Mississippi Transp. Comm'n v. Fires*, 693 So. 2d 917, 920 (Miss. 1997); *Terrain Enters., Inc. v. Mockbee,* 654 So. 2d 1122, 1128 (Miss. 1995). Evidence of drug charges and a related job suspension that occurred more than twenty years ago is hardly relevant to the symptoms Gandy has experienced since the 1994 train wreck. Dr. Bell testified the charges were so remote in time that they would be only of minimal interest to him in his diagnosis of Gandy.

¶15. The Railroad further asserts that the trial judge should have allowed into evidence the deposition of forensic toxicologist Dr. Francis M. Esposito and the proffered testimony of Dr. David T. Stafford, its expert toxicologist. Dr. Esposito's deposition indicates that a trace amount of marijuana metabolites (THC) was found in a urine sample which was taken from Gandy on the date of the accident and tested using gas chromatography and mass spectrometry. Blood tests taken to determine the presence of drugs in his blood stream had proven negative. Dr. Esposito stated in his deposition that the results were such that Gandy would not have been impaired cognitively or mentally at the time of the accident. In a 1996 deposition, Gandy testified that the night before the accident, he had driven around for several hours in a small pick-up truck with a friend who was terminally ill with cancer and who was smoking marijuana as recommended by his doctor in addition to prescription THC tablets. The Railroad, however, proffered that Dr. Stafford would have testified that the THC concentration in Gandy's urine sample was indicative of active consumption of the drug and could not have resulted from passive inhalation.

¶16. There is no evidence in the record to support the Railroad's contention that Gandy had any kind of drug problem; rather the record is replete with evidence that he was a responsible, hard-working man, who had a relatively exemplary record over his many years of service with the railroad. The Railroad's mischaracterization of the evidence in its brief illustrates clearly how the danger of prejudice far outweighed any probative value the evidence held. The circuit court therefore did not abuse its discretion in excluding the evidence. IV.

¶17. The Railroad next asserts that Gandy violated M.R.C.P. 26(b)(4)(A)(i) by failing to file his expert witness disclosures until March 12, 1997, twelve days before trial. Thus, the Railroad argues, the circuit court should have granted its motion for a continuance or excluded Dr. Bell's testimony.

¶18. Rule 26(b)(4)(A)(i) provides that "[a] party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." The purpose of the rule is to avoid "trial by ambush." *T.K. Stanley, Inc. v. Cason,* 614 So. 2d 942, 950 (Miss. 1992)(quoting *Harris v. General Host Corp.*, 503 So. 2d 795, 796 (Miss. 1986)). The record in the case clearly indicates that the Railroad had adequate notice of the expert witness and the subject of his opinion testimony. In the answers contained in his April 26, 1996, response to the Railroad's first set of

interrogatories, it is abundantly clear that Gandy intended to call Dr. Bell as an expert witness and that Dr. Bell would testify that he suffered from post-traumatic stress disorder and, because of the trauma, was unable to work on trains. Further, Dr. Bell had written to L.W. King, Gandy's Supervisor, on October 31, 1995, that Gandy continued to suffer from post-traumatic stress disorder and that, while medical records might indicate that he was physically capable of resuming his old responsibilities, he was psychologically unable to do so. Contrary to the Railroad's statement in its brief that "Dr. Bell's records were completely confidential and unaccessible by the railroad," Dr. Bell's notes and treatment records were produced to the Railroad on November 18, 1996. The Railroad was neither ambushed nor surprised by Dr. Bell's testimony or the content thereof, nor was Gandy evasive in his responses. This case, therefore is distinguishable from *Cason*, upon which the Railroad relies, where this Court found that the plaintiff's medical expert's testimony as to the extent of her disability should have been excluded where supplemental answers to interrogatories indicated only that his testimony would address the issue of causation. *Cason*, 614 So. 2d at 950-51.

V.

¶19. When, as in the case *sub judice,* a case is brought under FELA in state court, debates over state substantive law are irrelevant because "the rights and obligations of the parties are governed by the act, 45 U.S.C.A. §§ 51 to 60, and by federal principles of common law." *Donovan v. Port Auth.Trans-Hudson Corp.,* 707 A.2d 171, 174 (N.J. Super. Ct. App. Dir.1998). In arguing that Gandy's expert failed definitely to prove the permanence of his injuries, the Railroad, however, discusses a variety of factually distinguishable Mississippi cases and neglects to point out that in FELA cases, it is well-established that the permanence of a worker's injuries is a question of fact for the jury to determine. *Louisville & Nashville R.R. v. Richardson*, 231 So. 2d 316, 319 (Ala.1970); *Johnson v. Chesapeake & Ohio Ry.,* 6, 150 N.W.2d 178 (Mich. Ct. App. 1967).

¶20. The railroad bases its attack on Gandy's economic expert, Dr. Fred Johnson, on the theory that Gandy could have found other work since his injuries precluded him from working only as a conductor or a trainman and that he pulled numbers upon which he based his figures "out of a hat." Gandy did return to work for the Railroad after he was injured, working as a yard master and non-union flagman. As he and his former co-workers testified, however, Railroad employment is governed by the strict categorization of jobs and union affiliations and as well a seniority system within each category. Thus, Gandy's more than twenty years' seniority as a conductor/trainman does not assure him another position with comparable pay with the Illinois Central or any other railroad. Indeed, the railroad's peculiar system of seniority within union-specified job classifications has been cited as factor for juries to take into consideration when making awards of lost wages and earnings capacity in these cases. *Wiles v. New York, Chicago & St. Louis R.R.,* 283 F.2d 328, 332 (3d Cir. 1960). Under FELA, an injured worker has the right "to recover damages for his inability to secure the type of work he was performing before the accident from another employer because of the injuries for which defendant is liable." *Donovan*, 707 A. 2d at 175 (even where the injured worker is still employed by the railroad and has not lost wages, he may recover for future lost wages upon proof that his "economic horizons have been limited by his injury.)" (quoting *Wiles*, 283 F.2d at 331-32).

¶21. As to its assertion that the testimony of Gandy's economist should have been excluded, the Railroad argues only that Johnson pulled figures "out of thin air" in calculating Gandy's future earnings capacity and that he could not specifically limit Gandy's earnings capacity because, as he testified, "I'm not an employment expert that can say he can make $12.00 an hour or $6.00 an hour." The economist's figures

were based on Gandy's present earnings of $6.50 an hour as a security guard. The admission of relevant testimony is within the discretion of the trial court. *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 260 (Miss. 1993). The Railroad's assertion would appear to go more to the credibility of the witness than the admissibility of his testimony. Moreover, the only objection voiced by the Railroad to Dr. Johnson's testimony at trial was its general assertion that Dr. Bell failed to prove with reasonable medical certainty that Gandy would not be able to work as a conductor and thus, it was not proper to admit Dr. Johnson's testimony or submit the issue of future lost earning capacity to the jury. *See Richardson,* 231 So. 2d at 319 (when there is "evidence from which there is a *reasonable inference* that a plaintiff's injuries are permanent," actuarial testimony was admissible for calculation of lost earnings power)(emphasis added).

¶22. Although it cites no authority to support its position, the Railroad, by its captioning of this assignment of error, appears to contend that the circuit court should have directed the verdict on the issue of future disability. However, in FELA cases, "'a directed verdict is possible only when there is a complete absence of probative facts supporting the nonmovant's position.'" *Central of Georgia R.R. v. Mock*, 499 S.E.2d 673, 675 (Ga. Ct. App.1998)(quoting *Bagley v. CSX Transp.*, 465 S.E.2d 706 (Ga. Ct. App. 1995)). Dr. Bell's testimony provides probative evidence of Gandy's present and future disability. A directed verdict, therefore, would not have been appropriate in this case.

VI.

¶23. The Railroad concludes its assault upon the jury's general verdict by announcing that "[t]his is the largest verdict based solely on a psychological injury in the history of Mississippi jurisprudence." It argues that the verdict was totally unreasonable and evidenced bias, passion and prejudice. No authority is cited for the assignment of error and thus, it is procedurally barred. *In re Estate of Mason v. Fort*, 616 So. 2d 322, 327 (Miss. 1993); *R.C. Petroleum, Inc. v. Hernandez*, 555 So. 2d 1017, 1023 (Miss. 1990).

¶24. If we consider the merits of Illinois Central's argument, however, it can be seen that there exists no reason whatsoever for this Court to conclude that damages of $750,000 are in any way excessive in this case.

¶25. This Court accords great deference to jury verdicts. *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 263 (Miss. 1993 ); *Detroit Marine Eng'g v. McRee*, 510 So. 2d 462, 471 (Miss. 1987). This is because our constitution provides that "[t]he right of trial by jury shall remain inviolate, . . ." *See* Miss. Const. art. 3, § 31. It follows that "[a]wards fixed by jury determination are not merely advisory and will not under the general rule be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So. 2d 942, 945 (Miss. 1992). The same standard applies in federal cases. *See Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983).

¶26. "It has long been settled that questions concerning the measure of damages in an FELA action are federal in character." *Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 493 (1980). *See also Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985). (When FELA cases are brought in state court, federal law governs the substantive rights of the parties). Indeed, "[m]ore consistent results have thus been achieved in FELA actions than is possible in the case of other torts where each state is free to follow its own damages rules." Am.Jur. Trials Federal Employers' Liability Act Litigation § 34.11 (1966).

We do not reverse a jury verdict for excessiveness except on "the strongest of showings." The jury's

award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to." Nonetheless, when a jury's award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. Our power to grant a remittitur is the same as that of the district court. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded.

*Caldarera*, 705 F.2d at 784 (citations omitted). "We review a claim of excessiveness by comparing the awards at issue with rulings in other factually similar cases decided under controlling law, . . ." *See Marcel v. Placid Oil Co.*, 11 F.3d 563, 568 (5th Cir. 1994) Further, "[w]hile pain and suffering is, to a large degree, not susceptible to monetary quantification, and the jury thus necessarily has especially broad leeway, nevertheless, '[t]he sky is simply not the limit.'" *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1427 (5th Cir. 1988) (citations omitted).

¶27. In *Hall v. Norfolk So. Ry. Co.*, 829 F. Supp. 1571 (N.D. Ga. 1993), a railroad employee was thrown from the engine of a train which collided with another train. Three people were killed in the wreck. The employee testified that he sought treatment the day after the collision for pain in his hip, elbow and wrist. At trial, he sought damages for post-traumatic stress disorder and the hip injury. The jury awarded the employee $700,000 after being requested by the employee's attorney to return a verdict of $900,000 representing $450,000 in lost wages (past and future) and $500,000 for pain and suffering. On appeal, the railroad argued that $700,000 was an excessive amount. The district court disagreed finding that even if the employee's lost earnings amounted to only $190,000, as the railroad argued, an award of approximately $500,000 for pain and suffering was not excessive.

As recounted above, plaintiff here testified to a gruesome event on the night of the accident. He was trapped in a wrecked train engine while fires burned nearby and he heard people moaning. When he was able to free himself, he saw fellow crew members wandering the woods and crying. He attempted to rescue the engineer who was killed in the accident and then tried, at risk to himself, to call for help. Plaintiff also has continued to suffer psychological stress from the accident, and, according to his testimony and his son's testimony, has lost substantial enjoyment in life. How a jury would quantify these injuries is difficult, if not impossible, to estimate. Under these circumstances, however, an award of $700,000 for lost wages and for pain and suffering does not shock the Court's conscience. Accordingly, the Court denies defendant's motion for remittitur.

*Hall*, 829 F.Supp. at 1585.

¶28. Like Hall, Gandy suffered physical injuries.[2] Like Hall, Gandy attempted to assist the victims who were in worse shape than he. While the wreckage of the two trains burned, Gandy stayed with one of the engineers who was in terrible shape and going into shock. The engineer died later that night. Like Hall, Gandy continues to be traumatized by the collision and suffers from post traumatic stress. Gandy is unable to get on a locomotive and the smell of diesel fuels terrifies him.

¶29. The jury in this case returned only a general verdict. Given the difficulty of interpreting general verdicts,

jury decisions on general verdicts should be given deference. Furthermore, there is no evidence that the jury in this case was influenced by bias or passion.

VII.

¶30. From the beginning of this litigation, the Railroad sought to disqualify Gandy's attorney, Frank O. Burge, Sr., alleging a conflict of interest. In separate actions against the Railroad filed in Mississippi and Tennessee, Burge represented Q.B. Gray, the engineer on Gandy's train, as well as Royce Crowley[3] and the estate of Jerry L. Plunk, the trainmen operating the train that collided with Gandy's train.[4] The Railroad requested that Gandy's allegations of negligence against Plunk and Crowley, filed in the Circuit Court of Tennessee, Thirteenth Judicial District, be dismissed, or in the alternative, that Burge be disqualified from representing him. The circuit court overruled the motion on December 23, 1996, a decision which the Railroad now appeals.

¶31. Again, the Railroad has provided no authority for this assignment of error and thus, the matter is not properly before this Court. *In re Estate of Mason v. Fort*, 616 So. 2d 322, 327 (Miss. 1993); *R.C. Petroleum, Inc. v. Hernandez*, 555 So. 2d 1017, 1023 (Miss. 1990). Procedural bar notwithstanding, this Court has held that "[t]here is nothing wrong with a lawyer representing two clients in the same cause of action so long as the interests of the clients in that cause parallel each other." *Hartford Accident & Indem. Co. v. Foster,* 528 So. 2d 255, 268 (Miss. 1988). "Where the objectives of the clients are adverse to one another, however, the attorney will almost certainly be faced with a conflict of interest problem." *Id.* Construing Rule 1.7 of the Mississippi Rules of Professional Conduct, Conflict of Interest, and the comments thereto, we explained:

> Where the interests of the two parties are in some manner antagonistic to one another, before any lawyer is authorized to assume dual representation (or continue if the adversity appears after he has been retained), he must first satisfy himself that there is no objective reason why he cannot, despite such divergence of interest, faithfully represent them both. If this cannot be met, the lawyer should not accept employment in the first place (or terminate it, if begun). Secondly, even if the lawyer reasonably (and from an objective point of view) believes he can faithfully represent dual parties with adverse interests, he still must fully explain all implications of the advantages as well as the risks of his representation to both parties, and assure himself that they both have given knowing and informed consent.

*Foster*, 528 So. 2d at 268. There is no reason why the same considerations should not be applicable when determining the propriety of an attorney's representation of similarly situated litigants as in the case *sub judice*.

¶32. In the case brought by Jerry Plunk's estate in the Circuit Court of Tennessee, the Railroad likewise asserted both at the trial level and on appeal that Burge's representation of Gandy, Gray, Crowley and Plunk was a conflict of interest because of allegations that the Railroad was vicariously liable through the acts of its agents, servants or employees. Asked by that court to consider specifically whether Burge's former representation of Crowley conflicted with his representation of the Plunk estate, the Board of Professional Responsibility of the Supreme Court of Tennessee, in a September 24, 1996 letter opinion, found no basis for the assertion that Burge would be required to take inconsistent positions in representing the various plaintiffs in these cases since no allegations of negligence had been raised against any of them. The Railroad has shown nothing to the contrary. Procedural bar notwithstanding, therefore, the circuit court

should not be held in error for refusing to grant the relief sought by the Railroad.

¶33. Finding no error in any of the issues raised by Illinois Central, we affirm the judgment of the Marshall County Circuit Court.

¶34. **JUDGMENT IS AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS AND WALLER, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., MILLS AND COBB, JJ.**

**SMITH, JUSTICE, DISSENTING**:

¶35. I respectfully dissent because the trial court improperly limited Illinois Central's cross-examination of William R. Gandy and his treating psychologist as well as improperly excluded the railroad's proffered evidence to complete Gandy's medical and behavioral history.

¶36. However, there are other problems with the $400,285 lost income portion of the verdict. Because of the denial of certain defense expert testimony, the railroad was unable to show the other factors, such as drug use, that contributed to or were the primary reasons for Gandy not being able to work.

¶37. In addition, the trial court erred in not excluding the testimony of Gandy's psychologist or, at the least, in not granting Illinois Central a continuance because of Gandy's late and incomplete discovery response supplementation concerning the psychologist's trial testimony.

¶38. The jury verdict of $750,000 appears to be primarily based upon the testimony of Gandy's treating psychologist, Dr. Bell, whose diagnosis was that Gandy suffered from post-traumatic stress disorder (PTSD). Dr. Bell testified that this diagnosis requires that a psychologist review a patient's life over an extended period of many years and that a complete and extensive personal history is also required. Both Gandy and Dr. Bell were allowed to testify in great detail to favorable facts encompassing many years of Gandy's life which supported Gandy's PTSD condition. Dr. Bell's diagnosis was not based on objective findings, but rather was solely based upon Gandy's history as related to Dr. Bell by Gandy. Gandy's life history as told to Dr. Bell was certainly far less than candid.

¶39. Illinois Central, well aware of Gandy's complete history, wanted the jury to be so informed. However, the jury was not allowed to hear evidence from Illinois Central which would have attacked Gandy's credibility. Nor was the jury privy to testimony which would have possibly weakened significantly the foundation for Dr. Bell's diagnosis and his ultimate opinion that Gandy suffered from PTSD due solely to his involvement with train accidents while employed with the Illinois Central Railroad. The first of these accidents occurred in 1969, some twenty-eight years prior to trial of this case, and the jury was allowed to hear this evidence and its importance to Dr. Bell's opinion. The majority writes that "evidence of drug charges and a related job suspension that occurred more than twenty years ago is hardly relevant to the symptoms Gandy has experienced since the 1994 train wreck." The majority ignores the proffered testimony of Dr. Bell as well as Gandy's obvious failure to tell Dr. Bell the truth about his personal history.

¶40. Illinois Central believed that Gandy's long history of drug abuse was extremely important in developing the proper diagnosis of Gandy and what effect drug use had upon his inability to work. In 1971 Gandy was

charged with possession of marijuana and unlawful possession of LSD with intent to sell. He pled guilty to possession of LSD and marijuana. In 1972 Gandy was charged and convicted of manufacture and possession of marijuana, and he was dismissed from his job at Illinois Central. On the date of this train accident in the case at bar, as required by federal law, all of the employees on the train involved were subjected to drug screens. The results of the drug screen test showed that marijuana metabolites (THC) were found in a urine sample taken from Gandy. In his deposition, Gandy testified that he had not actually smoked marijuana for over twenty years. Gandy claimed that on the night before this accident that he was riding in a vehicle with a friend and had merely been "lighting one for a friend." However, Dr. Francis Esposito, a forensic toxicologist, disputed this claim by stating in his deposition that the level of THC in Gandy's body could not be the result of passive inhalation. Dr. David Stafford's stipulated testimony also would have refuted Gandy's claim. Gandy's history of drug abuse was relevant and critical as it related to Dr. Bell's diagnosis. Gandy's testimony would thus have been significantly impeached had Dr. Esposito's and Dr. Stafford's testimony been allowed. Exclusion of their relevant testimony was improper.

¶41. More importantly, Gandy only told Dr. Bell about the one marijuana conviction. Dr. Bell gave Gandy a checklist concerning the use of marijuana, LSD, heroin, and other drugs. Gandy checked no on all of these inquiries. He never advised Dr. Bell about his conviction for possession of LSD. During the in-chambers proffer, Dr. Bell stated that a patient's criminal history is an important part of a patient's history as well as a recognized criterion for distinguishing between malingering patient by a patient suffering from possible PTSD. Dr. Bell stressed the importance "in the truth of what the patient is telling you." Dr. Bell stated that had he known that Gandy had three criminal convictions, such information would have constituted a red flag to him. Dr. Bell admitted in chambers that these facts would suggest that Gandy definitely had something to hide. Dr. Bell, in referring to Gandy, also stated that "I guess I would have to question whether or not he was a reliable historian." Dr. Bell opined that developing a psychological diagnosis includes examining a patient's history of drug usage as well as current drug usage. Dr. Bell's diagnosis was not supported by psychological testing. An MMPI test possibly would have ascertained whether Gandy was faking or malingering, but Dr. Bell choose not to administer this test to Gandy. The very nature of Dr. Bell's diagnosis of PTSD placed Gandy's credibility and accuracy regarding his history as he related to Dr. Bell at issue in this case.

¶42. In considering the issue of the patient-psychologist relationship concerning evidence of prior criminal convictions and psychological testimony where a psychologist testified that old criminal convictions were relevant and that "he would have been interested in and would have carefully considered" such offenses in the psychiatric assessment of a party, this Court found no error in admitting such testimony under M.R.E. 609 and 403. *White v. State*, 542 So. 2d 250, 257-58 (Miss. 1989). The Court held that past acts under these circumstances are always relevant. *Id.* Here, as in *White*, Dr. Bell was aware of one prior conviction, used it among other gathered history taken from Gandy in arriving at his analysis and diagnosis of Gandy. Dr. Bell admitted that had he known of other related convictions and facts that Gandy neglected to mention, they would have constituted "red flags" and that they were pertinent to his diagnosis. The trial court erred in denying Gandy's complete history to be exposed to the jury and in refusing to allow Dr. Bell's diagnosis to be attacked.

¶43. The trial court's denial of Illinois Central's the right to expose Gandy's complete history, attack its accuracy, and Dr. Bell's diagnosis is even more egregious considering that Gandy was presented to the jury as one of the finest workers this railroad has ever had. Gandy introduced testimony from five co-workers who solely testified about his good character. And yet, Illinois Central was denied the right to contradict

that testimony by showing that Gandy had been fired and/or suspended because of bad conduct including his drug-related suspensions, during the same time frame of his good conduct described by his co-workers. Had the jury heard this excluded testimony, the verdict could have been different. Illinois Central should have been allowed to present testimony to the jury concerning Gandy's continuing use of marijuana and its possible adverse impact upon Gandy's psychological health. The jury was entitled to hear and determine for itself whether Gandy was stressed out and whether his prior drug usage and convictions, continuing drug usage, and possible loss of his job for a second time might be the ultimate cause of this stress or if not, whether it was a substantial contributing factor to Gandy's psychological problems which could have significantly reduced the verdict. Denial of the expert testimony by the defense clearly created a hurdle which Illinois Central could not possibly overcome and could have easily contributed to such a large verdict regarding Gandy's mental health. *See Mississippi Power & Light, Co. v. Lumpkin,* 725 So. 2d 721 (Miss. 1998); *General Motors Corp. v. Jackson,* 636 So. 2d 310 (Miss. 1992). The denial of the right to cross-examine Gandy and his expert regarding these relevant issues goes to the very heart of a valued and crucial aspect of our jurisprudence and should not be permitted by this Court. *See Miskelley v. State*, 480 So. 2d 1104, 1112 (Miss. 1985); *Prewitt v. State*, 156 Miss. 731, 126 So. 824, 825 (1930). Quoting *Myers v. State*, 296 So. 2d 695, 700 (Miss. 1974), in *Miskelley* we stated:

> The right of confrontation and cross examination is not satisfied by a witness submitting himself to token interrogation but extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony.

*Miskelley,* 480 So. 2d at 1112. The absolute unfairness of the denial of cross-examination on this relevant issue as well as the denial of the railroad's expert testimony on the subject was compounded by Gandy's counsel's closing argument when counsel asked, "what evidence disputes Dr. Bell? None, ma'am. None sir. Only lawyer's talk stands before you."

¶44. Then, there is the matter of Illinois Central's claim that Gandy failed to properly comply with Miss. R. Civ. P. 26(b)(4)(A)(i). Although the railroad filed interrogatories and requests for production of documents regarding Gandy's experts to be used at trial in February 1996, Gandy did not file expert disclosures until March 12, 1997, twelve days before trial on March 24th. By then Gandy had produced some, but not all, of his records. The railroad then attempted to depose Dr. Bell, who was disclosed on that date as the sole expert witness regarding Gandy's PTSD condition. The first deposition was abruptly terminated when Dr. Bell announced that he had only allowed forty-five minutes for the deposition. The second attempt to conclude Dr. Bell's deposition on March 19th also ended when Dr. Bell stated that he had only allowed one hour and would not be available to conclude the deposition. Defense counsel had, by necessity, used the majority of the one hour deposition time having Dr. Bell decipher his hand-written records. Thus ended the saga of the attempts to take Dr. Bell's depostion.

¶45. On the morning of trial, Illinois Central moved the court for a continuance, and the motion was denied. Gandy's counsel, in response to Illinois Central's continuance request erroneously claimed that Dr. Bell was "the railroad's doctor." In fact, the Methodist Family Counseling Center, rather than Illinois Central, referred Gandy to Dr. Bell. The physician-patient privilege was clearly established, and Gandy's records were thus confidential and inaccessible to the railroad except through proper discovery under the rules. Gandy's discovery supplementation only listed Dr. Bell and stated that he would testify that Gandy suffered from PTSD.

¶46. Miss. R. Civ. P. 26(f)(1)(B) requires timely discovery response supplementation identifying the expert's name and subject matter on which he is expected to testify, and **the substance of his testimony.** Expert testimony should be precluded for failure to fully disclose the opinions upon which the expert was to testify. *T.K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 950-51 (Miss. 1992); *see also **Broadhead v. Bonita Lakes Mall, Ltd. Partnership**, 702 So. 2d 92, 102-03 (Miss.1997); **Simmons v. Bank of Mississippi**, 593 So. 2d 40, 43 (Miss. 1992). Considering the extremely late notice, and especially the circumstances and magnitude of the problems that Illinois Central experienced with the attempted taking of Dr. Bell's deposition, the trial court should have at least granted the Illinois Central a continuance. These errors warrant a new trial.

¶47. For the reasons discussed, I respectfully dissent.

## PRATHER, C.J., MILLS AND COBB, JJ., JOIN THIS OPINION.

1. Royce Crowley testified, too, that it was a "frightful experience," and that he doubted whether he could ever get on a locomotive again.

2. The Fifth Circuit adheres to the view that recovery for emotional distress need not be limited to those who have suffered physical injuries but may also be recovered by those in the "zone of danger." *Plaisance v. Texaco*, 966 F.2d 166 (5th Cir. 1992). *See also **Consolidated Rail Corp. v. Gottshall**, 114 S.Ct. 2396 (1994); Kruk & Bourdeau, "Recovery for Negligent or Intentional Infliction of Emotional Distress Under Jones Act" (46 U.S.C.S. §688) or Under Federal Employers Liability Act, 123 A.L.R. Fed. 583 (1995). Of course, because Gandy suffered physical injuries, there is no question but that he may recover for emotional distress.

3. Crowley was no longer represented by Burge at the time the Board of Professional Responsibility of the Supreme Court of Tennessee made its finding on September 24, 1996 that there was no conflict of interest created by Burge's representation of the various plaintiffs.

4. *Gray v. Illinois Cent. R.R.*, No. CV-95-0007-B/D (Circuit Court of DeSoto County, Mississippi); *Crowley v. Illinois Cent. R.R.*, No. 68285-3 T.D. (Circuit Court of Tennessee, 30th Judicial District at Memphis); *Plunk v. Illinois Cent. R.R.,* No. 02A01-9707-CV-00167 1998 WL 227772 (Tenn. Ct. App. May 8, 1998).