# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00498-COA

**ARTHUR YOUNG**                                                        **APPELLANT**

**v.**

**ILLINOIS CENTRAL RAILROAD COMPANY**                      **APPELLEE**

DATE OF JUDGMENT:                01/19/2018
TRIAL JUDGE:                          HON. JANNIE M. LEWIS-BLACKMON
COURT FROM WHICH APPEALED:  HOLMES COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      M. QUENTIN EMICK JR.
                                          C. E. SOREY II
ATTORNEYS FOR APPELLEE:        GLENN F. BECKHAM
                                          HARRIS FREDERICK POWERS III
NATURE OF THE CASE:              CIVIL - PERSONAL INJURY
DISPOSITION:                         AFFIRMED - 11/05/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McDONALD AND C. WILSON, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     This is an appeal regarding a claim that Arthur Young, an injured railroad employee, brought against Illinois Central Railroad Company (Illinois Central) pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 et seq. (2018). During trial, Illinois Central challenged the testimony of two of Young's experts. The circuit court granted said motion. Thereafter, a Holmes County jury found Illinois Central liable for the total amount of $1,300,000. Illinois Central challenged the verdict in several post-trial motions. It filed a motion for judgment notwithstanding the verdict (JNOV) on the jury's award of $1,000,000 for future damages and $100,000 for partial and total disability. Illinois Central also filed

three motions for a new trial, claiming (1) that the jury's additional verdict of $100,000 for past and present physical pain and suffering and $100,000 for past and present emotional suffering was against the overwhelming weight of the evidence; (2) that the court erred in its rulings during the jury-selection process; and (3) that the court erred in the jury instructions given. The circuit court denied Illinois Central's post-trial motions except for the JNOV motion regarding the jury's verdict of $1,000,000 in future lost wages which the court granted. Young appealed the circuit court's judgment regarding the court's exclusion of two of his expert witnesses and the future lost wages.[1] Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. Young, a high school graduate with one year of college education, was hired to work for Illinois Central as a trackman in 2007. On January 11, 2008, Young was working for Illinois Central in Memphis, Tennessee. In the course of his duties, Young was riding as a passenger in a Kubota tractor driven by his coworker, Jerry Brooks Jr., when a dump truck operated by Illinois Central's employee Michael Paul Wallace backed into the Kubota. The collision caused the Kubota to roll over. Young reported the incident to his foreman, to his supervisor, and to the assistant chief. Young contends that although he asked to go to the hospital, he did not go because his foreman, his supervisor, and the assistant chief did not want an accident report to be filed. Young wrote a statement in which he said that he only injured his elbow. But Young later contended that he felt pain in his elbow, head, neck, and back immediately after the accident. Young was sent home for the rest of the weekend, but

_____

[1] Illinois Central filed no cross-appeal regarding the motions the circuit court denied and has reportedly paid Young the $300,000 award that the circuit court upheld.

he did not seek immediate medical attention.

¶3. The medical testimony showed that Young was treated by his local physician, Dr. Downer, for flu-like symptoms and/or his bronchitis on February 26, 2008; March 3, 2008; March 20, 2008; June 9, 2008; September 18, 2008; October 6, 2008; and October 14, 2008. But he never mentioned having any injuries as a result of the accident at any appointment.

¶4. In August 2008, Young wrote a letter to Illinois Central indicating that he was having mental and emotional issues as a result of the accident. Illinois Central granted him a medical leave of absence from August 4, 2008, to October 20, 2008. During Young's leave of absence, he sought psychological assistance for his nightmares from Life Help[2] in Greenwood.

¶5. Between October 20, 2008, and August 5, 2016, Young received sporadic orthopaedic medical care from Dr. Ronald Childress. Young's initial visit to Dr. Childress was the first time that Young complained of his alleged back injuries as a result of the accident. Throughout this time, Young continued to work for Illinois Central, and he was promoted to the position of a production-support foreman.[3]

¶6. On May 27, 2010, Arthur Young filed a complaint pursuant to FELA against Illinois Central in the Holmes County Circuit Court. Young sought to recover for the injuries and related damages he suffered during the January 2008 job-related accident. Illinois Central

---

[2] Life Help is a full-service-community mental health facility.

[3] There is nothing in the record to compare Young's pay as a trackman to his pay as a production-support foreman. Therefore, there is no evidence that there was a loss of pay in present or future income.

answered and denied that Young suffered any injuries.

¶7.    In a pre-trial order filed on August 22, 2017, Young designated three experts to testify at trial—Dr. Ronald G. Childress, his treating orthopedic physician; Dr. Frank Giles, a vocational expert; and Dr. Larry Lynch, an economist. In the pre-trial order, Illinois Central also admitted that the January 11, 2008 accident was due to the failure to use reasonable care by one of its employees, other than Young. But Illinois Central did not admit that Young suffered the injuries he claimed. Therefore, the sole issue at trial became damages.

¶8.    The case proceeded to trial on October 2, 2017. During trial, Young testified that he was hired as a track laborer but that his current position was to work as a production-support foreman. He stated that his current job entailed much of the same hard labor. He stated that after the accident he felt pain in his head, neck, back, and elbow, but he did not go to the hospital immediately after the accident allegedly because Illinois Central did not want an accident report to be filed. He stated that although he continued to go to work, he also continued to have pain. Further, Young testified that he did not feel that he could work much longer because it was getting hard for him to do anything.

¶9.    Dr. Childress, Young's treating orthopaedic physician, also testified at trial. Dr. Childress testified that he first saw Young on October 20, 2008, and that Young complained of back injuries as a result of the accident. At Young's initial visit, Dr. Childress's impressions were that Young had an acute lumbar spine strain with tendency for some numbness and tingling in his feet. He also testified that Young had a tension headache coming from an acute cervical spine strain. Dr. Childress recommended an MRI scan and

4

EMG nerve-conduction study; he also prescribed Young Daypro Darvocet medication. Young was told to follow up within two months or after the tests were completed. The MRI scan was performed on March 10, 2009. The MRI scan documented a small left-lateral C3-C4 disc bulge versus a mild bony hypertrophic spurring at the left C3/4 uncovertebral joint, but there was no evidence of spinal or neuroforaminal stenosis. There was a mild desiccation and disc degeneration at C2/3 and C3/4. Young did not follow up to get these results until July 12, 2011, more than two years later.

¶10. On that visit, Dr. Childress advised Young of the MRI-scan findings. Dr. Childress also testified that Young informed him that he "was having difficulty with the prescribed medication"; therefore, Dr. Childress advised Young to start taking over-the-counter pain medication. Although Dr. Childress advised Young to follow up with him within two months, Young's next visit was on February 21, 2014. During that visit, Dr. Childress observed "fair mobility of his cervical spine with rotation of thirty degrees lateral bending, of five degrees." "He had some tenderness in his upper back and his lumbar spine to palpation." Therefore, Dr. Childress encouraged Young to do stretches and light exercises. Young's next saw Dr. Childress on May 30, 2014. During that visit, Dr. Childress noted that Young was restricted in his mobility. Young reported to Dr. Childress that he was functioning but that he was struggling to function. Dr. Childress encouraged Young to do heat treatments with hot towels and hot tub soaks. Dr. Childress also recommended that Young see him within three months, but Young did not return until August 14, 2015. During that visit, Dr. Childress advised Young to take over-the-counter medicine for his pain but to

5

refrain from heavy activities if the pain did not subside. Young's last visit with Dr. Childress was on August 5, 2016. Dr. Childress concluded that Young suffered trauma from the January 2008 accident and that he had both an acute and a chronic cervical and lumber spine strain with cervical and lumbar disc pathology associated with his strain. Dr. Childress advised Young that if he had increasing problems and difficulty to the extent that he did not feel safe working that he should request time off or consider other options for intervention.

¶11. On direct examination, Young's counsel asked Dr. Childress about Young's ability to continue with his particular profession:

Q: Do you have an opinion based upon a reasonable degree of medical probability of Mr. Young's ability to continue with this particular profession?

A: I don't think it's in his best interest or the company's best interest to have him do so because he has [an] underlying structural problem. The fear is that he could further damage those areas that already have abnormality. He could make the disc rupture bigger to the extent he has to have a surgery. So that in my mind it would be better for him to do a job that does not require the severe straining, lifting, walking on uneven surfaces, et cetera, in an effort to avoid a problem that forces him to have a procedure done.

¶12. But on cross examination, Dr. Childress testified:

Q: I'm wrapping [up] here, Dr. Childress. You testified on direct examination that you would not recommend Mr. Young continue the very heavy work he's doing now, vibrating tools, uneven surface, working on uneven surfaces. But you also testified in your deposition he could probably be a manager indefinitely?

A: It depends on what the managing job entails. If it does not entail uneven surfaces, heavy tools, vibratory tools, and more or less that doesn't require strenuous activity, he'd have better longevity, better safety, and better capability to function.

6

Q:      But you're not saying Mr. Young can't work anymore, are you?

A:      No.

¶13.    Following Dr. Childress's testimony, Young attempted to call Dr. Frank Giles, a vocational expert. Illinois Central moved ore tenus to exclude Dr. Giles's testimony, and the jury was excused. Illinois Central argued that Dr. Giles's report did not consider Young's ability to find other employment or include the value of other potential employment. Illinois Central argued that Dr. Giles's opinion regarding Young's earning capacity was not consistent with Dr. Childress's testimony that Young was physically capable of working and possessed an earning capacity. Therefore, Illinois Central averred that Dr. Giles should not be allowed to testify as to future lost wages.

¶14.    In response, Young proffered Dr. Giles's vocational report. In Giles's report, he quoted a letter from Dr. Childress[4] dated September 12, 2014, which indicated, "with reasonable medical certainty, these injuries have caused permanent impairment . . . ." Dr. Giles also quoted Dr. Childress's October 4, 2016 letter, which stated:

> I do not feel that [Young] would be able to continue safely at his present employment for more than 6 to 12 months, probably sooner. It will be in his best interest to discontinue this employment and have his cervical and lumbar disc managed with appropriate therapy and possible injections and/or surgical intervention, if he has worsening difficulty. . . .

Based on Dr. Giles's understanding that Dr. Childress would testify that Young was unable to work at his current job and would become permanently disabled, Dr. Giles's report reflected an annual wage loss of $62,649.60. Dr. Giles did not give an opinion as to what

---

[4] Dr. Childress's letter that Dr. Giles relied upon is not in the record.

7

other employment Young could engage in and if that would still result in a future loss of wages.

¶15. In addition to challenging Dr. Giles's testimony, Illinois Central also moved to have the testimony of Young's economist, Dr. Lynch, excluded because his opinions were based on Dr. Giles's erroneous report making Dr. Lynch's opinions erroneous as well. Dr. Lynch was expected to testify by deposition video to the discounted value of the $62,649.60 per year loss-wage-earning figure that was provided in Dr. Giles's report. Dr. Lynch used Young's expected earning capacity through age seventy after reducing the lost income for taxes with a ten percent federal tax rate and a three to five percent Mississippi state rate. Dr. Lynch ultimately concluded, based on the figure provided in Dr. Giles's report, that Young's cumulative loss would be $956,977.

¶16. After argument of counsel, the circuit court granted Illinois Central's motions and excluded the opinions and testimony of Dr. Giles and Dr. Lynch. The circuit court held that Dr. Giles and Dr. Lynch "ignored Dr. Childress's opinion that Young could perform meaningful employment, and that Young possessed economic potential." The court further stated that it could not allow Dr. Giles's testimony because Dr. Childress's testimony was that Young was permanently impaired, but not permanently disabled.

¶17. After the conclusion of the testimony, on October 6, 2017, the jury awarded Young the following:

Past and present physical pain and suffering . . . . . . .$100,000
Past and present mental and emotional suffering . . . $100,000
Any partial and total disability . . . . . . . . . . . . . . . . .$100,000
Future wage loss . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,000,000

8

With total damages being . . . . . . . . . . . . . . . . . . . . $1,300,000[.]

¶18. On October 26, 2017, Illinois Central challenged the entire verdict through several post-trial motions. In a motion for JNOV, Illinois Central argued that it was entitled to a JNOV on the jury's award of future damages in the amount of $1,000,000 as well as the jury's award of partial and total disability in the amount of $100,000. Illinois Central also filed three motions for a new trial, asserting that (1) the jury's verdict awarding Young $100,000 for past and present pain and suffering and the jury's verdict awarding Young $100,000 for past and present emotional suffering was against the overwhelming weight of the evidence; (2) that the court erred during the jury selection process by denying its "for cause" jury challenges for jurors who lived in the same small community where Young resides; and (3) that the court erred in giving Jury Instructions JI12 and JI13 and in denying Jury Instructions D-8 and D-10.

¶19. On January 19, 2018, the circuit court granted Illinois Central's motion for JNOV as to the jury's verdict of $1,000,000 in future lost wages but denied the motion for JNOV challenging the jury's award for partial and total disability. The court also denied Illinois Central's motions for a new trial.

¶20. On February 9, 2018, Young timely filed his notice of appeal. Young argues that the circuit court erred in excluding his vocational and economic experts and erred in granting Illinois Central's motion for JNOV on the jury's verdict as to his future wage loss.

**ANALYSIS**

¶21. The "FELA creates a tort remedy for railroad workers injured on the job and serves

9

as the exclusive remedy for a railroad employee injured as a result of his or her employer's negligence." *Ill. Cent. R.R. Co. v. Brent*, 133 So. 3d 760, 766-67 (¶10) (Miss. 2013) (citing *Hogue v. S. Ry. Co.*, 390 U.S. 516, 517-18 (1968)); *see also Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004). "What constitutes negligence for [FELA] purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state or local laws for other purposes. Federal decisional law formulating and applying the concept governs." *Id.* "This Court is bound to enforce the federal law as Congress has provided and as the federal courts have read it." *Id.* (citing *Ill. Cent. Gulf. R.R. Co. v. Gibbs*, 600 So. 2d 944, 946 (Miss. 1992)). "As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal." *St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985). Accordingly, "it has long been settled that questions concerning the measure of damages in a FELA action are federal in character." *Ill. Cent. R.R. Co. v. Gandy*, 750 So. 2d 527, 534 (¶26) (Miss. 1999).

¶22. In granting Illinois Central's motion to exclude Young's vocational and economic experts, the circuit court relied on *Quinones-Pacheco v. American Airlines Inc.*, 979 F.2d 1 (1st Cir. 1992), and *Fashauer v. New Jersey Transit Rail Operations Inc.*, 57 F.3d 1269 (3d Cir. 1995). We find these cases applicable here.

¶23. According to *Quinones-Pacheco*, in tort actions, a plaintiff's loss of earning capacity is an economic concept that is based upon a medical foundation. *Quinones-Pacheco*, 979 F.2d at 6. "It is the plaintiff's burden to prove his or her claimed loss of earning capacity."

10

*Id.* In order to prevail, "he must offer evidence from which a jury may reasonably determine the annualized stream of income that the plaintiff, uninjured, would probably have earned, and contrast it, over the period of proven disability, to a similar forecast of what the injured plaintiff's earnings are likely to be." *Id.*; *see also Glasscock v. Armstrong Cork Co.*, 946 F. 2d 1085, 1091 (5th Cir. 1991) ("Recovery of damages for loss of earning capacity compensates a plaintiff for the difference between the income he could earn before his injury and the income he could earn after the injury."). *Fashauer* held that in order to prevail on a lost wages claim, one must provide evidence that (1) he or she cannot work, i.e., is permanently disabled or (2) if he or she can work, what work he or she can perform and how much he or she will earn from that type of work. *Fashauer*, 57 F.3d at 1284-85.

¶24.    In order to make a successful claim for future lost wages under FELA law, if there is not total disability, our supreme court has held that there must be evidence of the employee's inability to secure the type of job he was performing before the accident from another employer. *Gandy*, 750 So. 2d at 534 (¶26). In *Gandy*, a train conductor brought an action against the railroad company to collect damages under FELA for post-traumatic stress disorder caused by a collision. *Id.* at 529 (¶1). Gandy testified that he was unable to get on a locomotive and that the smell of diesel fuel terrified him. *Id*. at 529 (¶3). At the time of trial, Gandy was no longer working for the railroad but was working as a security guard. *Id*. at 533 (¶8). Gandy's psychologist testified that he did not think that Gandy would be able to work as a conductor at any time in the foreseeable future. *Id.* at 530 (¶5). There was also testimony that there were no non-conductor jobs in his seniority that would not require

11

getting on a train.  *Id.* at 530 (¶7).

¶25.   An economist also testified on behalf of Gandy.  He calculated the present value of Gandy's net income based on what Gandy was making the last full year that he worked for the railroad company, and the economist subtracted from that figure the present value of Gandy's current security-guard position to arrive at Gandy's lost income stream.  *Id*. at 533 (¶8).  When affirming the jury verdict, the *Gandy* court held that "under FELA, an injured worker has the right to recover damages for his inability to secure the type of work he was performing before the accident from another employer because of the injuries for which the defendant is liable."  *Id.*  Thus, the *Gandy* court found the testimony provided was sufficient to support the jury's verdict.

¶26.   The *Gandy* court also referenced *Wiles v. New York, Chicago & St. Louis Railroad Company*, 283 F.2d 328, 330 (3d Cir. 1960).  In *Wiles*, an employee of the railroad brought a FELA action for an injury sustained while using the railroad company's defective tool.  *Id*. The jury returned a verdict of $30,000 in favor of the employee, but the trial court set aside $20,000 of that amount, which was awarded for "loss of earning power."  *Id.*  On appeal, the trial court was reversed.  There was evidence that Wiles had a permanent, but minor, back deformity as a result of the accident.  *Id*. at 331.  Testimony showed that Wiles was employed by the railroad company at a higher salary than that which he was receiving at the time of the accident.  *Id.*  The key in *Wiles*, however, was testimony from a medical witness stating that Wiles would have difficulty getting a job in heavy industry with anyone other than his present employer.  *Id*. at 332.  The appellate court held that Wiles's economic horizons were

12

limited by his injury and, therefore, the evidence sustained the jury's $20,000 award of damages for loss of future earnings. *Id.*

¶27. In light of this case law, we now turn to the two issues on appeal: (1) whether the circuit court erred in excluding Young's vocational and economic experts and (2) whether the circuit court erred in granting Illinois Central's motion for JNOV as to his future loss earnings capacity.

### I.     Exclusion of the Expert Witnesses

¶28. As noted in our discussion of the law, entitlement to a future wage-loss award must be founded on testimony that Young was either totally disabled, that he could not obtain similar work from another employer, or that he was working at a lower-paying job due to his impairments. Young argues that the circuit court erred in excluding his vocational and economic experts who would have provided this testimony had they not been excluded.

¶29. "Our well-established standard of review for the trial court's admission or suppression of evidence, including expert testimony, is abuse of discretion." *Griffith v. Entergy Miss. Inc.*, 203 So. 3d 579, 587 (¶29) (Miss. 2016). The Fifth Circuit also reviews a district court's exclusion of expert testimony under the Federal Rules of Evidence for abuse of discretion. *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016). Additionally, the Fifth Circuit "give[s] the district court wide latitude in determining the admissibility of expert testimony under Federal Rule of Evidence 702, and its decision will not be disturbed on appeal unless manifestly erroneous." *Id.* (internal quotation marks omitted). We discern no abuse of discretion in the present case.

13

¶30.    Rule 702 of the Mississippi Rules of Evidence, which places the circuit court with the gatekeeping responsibilities of evaluating the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) their testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Canadian Nat'l/Ill. Cent. R.R. Co. v. Hall*, 953 So. 2d 1084, 1094-95 (¶30) (Miss. 2007); *see also Miss. Trans. Comm'n v. McLemore*, 863 So. 2d 31, 40 (¶25) (Miss. 2003) (adopting the *Daubert*[5] test concerning expert testimony).  The *McLemore* case discussed a two-prong test which examines both the relevance and the reliability of an expert witness to determine if testimony is admissible.  *McLemore*, 863 So. 2d at 40 (¶25). The trial courts have an important role as gatekeepers on questions of admissibility of expert testimony.  *Id.*

¶31.    Here, the circuit court essentially found that Dr. Giles's report was unreliable because Giles misinterpreted Dr. Childress's letter about Young being "permanently impaired" to mean that Young was "permanently disabled."  During trial, Dr. Childress did not testify that Young's impairment made him permanently disabled.  Rather, Dr. Childress stated that he did not think it was in Young's or the company's best interest for him to continue to work at his particular profession because Young had an underlying structural problem.  Dr. Childress also conceded that Young could work, but it depended on what the job duties entailed.  Because of Dr. Childress's testimony that Young was not permanently disabled and

---

[5] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 582 (1993).

14

that he could work, the circuit court did not abuse its discretion and correctly found that Dr. Giles's opinions regarding future loss wages were unreliable. There was no medical foundation or predicate to support Dr. Giles's proposed testimony as to future lost wages. There was no evidence supporting Dr. Giles's conclusion that Young was permanently disabled. Also, Dr. Giles failed to opine about what, if any, work Young could perform and how much he would earn from that type of work as required in *Quinones-Pacheco*, 979 F.2d at 6-7, and *Fashauer*, 57 F.3d at 1284-85. Therefore, this Court finds that the trial court did not abuse its discretion in striking or excluding Dr. Giles's testimony.

¶32. We next turn to the exclusion of testimony from Young's economist, Dr. Lynch. During Lynch's deposition, he stated that he based his report on, among other things, Dr. Giles's vocational report. His assumptions for his calculations are illustrated in the following exchange on cross examination:

> Q: Now, Mr. Lynch, tell the jury when your calculations beg[an]. That is, when did you assume Arthur Young would first start losing wages because he was not working at Illinois Central?
>
> A: My assumption – and it was – it was at the request of the law firm – is to assume that he would work through the year 2017 and would not be able to work beyond that.

Dr. Lynch's opinions rested upon the erroneous assumption that Young was permanently disabled and "would not be able to work beyond 2017." Therefore, Dr. Lynch calculated the future lost wages based on Dr. Giles's projected annual loss of $62,649.60, which as discussed was also erroneous. Because Dr. Lynch's report relied on Dr. Giles's faulty report, Dr. Lynch analysis was unreliable and was therefore also properly excluded.

15

## II. Judgment Notwithstanding the Verdict

¶33.    "In order to rule on a motion for JNOV, the trial court is required to consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 63 (¶21) (Miss. 2004).  "[I]f there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required." *Id*. at (¶23).  "In reviewing a circuit court decision on a motion for JNOV, this Court does not defer to the circuit court's decision but rather reviews the matter de novo." *Id.* at 64 (¶24).  We must accept all facts that the plaintiff's evidence reasonably tends to prove and all favorable inferences that are fairly deducible. *Hampton v. Magnolia Towing Co.*, 338 F.2d 303, 306 (5th Cir. 1964).  If the evidence, when viewed in the light most favorable to the plaintiff, can possibly sustain his or her case, the motion for JNOV cannot be granted. *Id*.

¶34.    In granting Illinois Central's motion for JNOV as to Young's future loss of earning capacity and future loss of earnings, the court reasoned that Young failed to put forth sufficient evidence to allow the jury to reach the $1,000,000 future wage-loss verdict. Young argues that the court erred in granting Illinois Central's motion because there was sufficient evidence to support the jury's verdict.  We disagree.

¶35.    Here, Young's only evidence of damages was provided through his testimony and the testimony of his medical doctor, Dr. Childress.  Young testified that he could no longer

16

perform his duties at the railroad. Dr. Childress, Young's treating physician, testified that he did not think it was in the best interest of Young or the company for Young to continue with his particular profession. Dr. Childress also testified that it would be better for Young to perform work that does not require severe straining, lifting, or walking on uneven surfaces. But according to Dr. Childress, even though Young had a permanent impairment, he could perform work at other jobs. Notably, there was no evidence presented that Young would have difficulty finding a job elsewhere in the industry or that he had ever sought work elsewhere. There was no evidence that demonstrated Young's economic horizons outside of his current employer. Moreover, any quantification of lost earnings by Dr. Giles and Dr. Lynch was properly excluded, leaving no economic testimony to support the jury's verdict. In order to make a successful claim for future lost earnings under FELA law, if there is not total disability, there must be evidence of the employee's inability to secure the type of employment he was performing before the accident from another employer. *Gandy*, 750 So. 2d at 534 (¶26); *Wiles*, 283 F.2d at 330. In this case we do not have such evidence. We do not find that the evidence in the record meets the threshold required for a future economic loss verdict as outlined in *Gandy*, 750 So. 2d at 534 (¶26). There was only evidence that at an uncertain point Young would be unable to perform his duties at his current job. Therefore, even considering the facts in a light most favorable to Young, we find the record lacking in sufficient evidence to support the jury's verdict for future lost wages.

## CONCLUSION

¶36.  Finding no error, we affirm the judgment of the Holmes County Circuit Court.

17

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**