635 So.2d 875 (1994)
JAMES W. SESSUMS TIMBER COMPANY, INC. and Guy O. Wilcher d/b/a Guy O. Wilcher Logging
v.
Ney T. McDANIEL.
No. 90-CA-01287.
Supreme Court of Mississippi.
April 7, 1994.
*876 S. Wayne Easterling, Hattiesburg, for appellant.
Eddie H. Bowen, Raleigh, for appellee.
En Banc.
PITTMAN, Justice, for the Court:

ON PETITION FOR REHEARING
The original opinion is withdrawn and this opinion is substituted therefor.
Highway 35 and 18 intersect in the Town of Raleigh. On the morning of April 9, 1990, Ney McDaniel (McDaniel) stopped his vehicle on the west side of Highway 35 close to the intersection. McDaniel was seated on the driver's side of his vehicle. Glover Ealy, Jr., driving and operating a log truck on Highway 35, was pulling a trailer load of logs which, in violation of Miss. Code Ann. § 63-5-19 (1972), exceeded the legal length by more than 8 feet. Ealy approached the intersection, passed McDaniel's vehicle within four feet of its left side, and proceeding at approximately 30 mph, made a left turn onto Highway 18 east. The logs extending beyond the trailer's rear axle struck McDaniel's vehicle on the driver's side and broke the front window. Shattered glass struck McDaniel in the face injuring his eye.
Willie Turner, employee of a nearby service station, noticed Ealy's truck and the extended logs prior to the collision. Anticipating that the truck driver's immediate left turn would cause the extended logs to strike and collide with McDaniel's vehicle, Turner endeavored, without success, to stop Ealy. Turner waved his arms but Ealy failed to respond.
After the collision, Ealy stopped and exited the truck. Turner noticed that Ealy's eyes were red. He described Ealy as being drunk.
Tommy Scott, state trooper with the Mississippi Highway Patrol, arrived shortly after the accident. He observed that Ealy had trouble walking, his speech was slurred, and the smell of intoxicating liquor was prevalent. Scott ran a field sobriety test on Ealy with *877 an alco-sensor, a device used to determine if one has been drinking intoxicating liquor. The sensor tested positive. Scott ascertained that Ealy had a .24 blood alcohol content, more than twice the .10 permissible limit. Ealy was arrested and charged with driving while intoxicated.
McDaniel made three trips to his ophthalmologist for eye treatment and incurred $105.00 in medical bills. He experienced excruciating eye pain for approximately one month and missed five days from work. Fortunately, McDaniel, an attorney engaged in oil and gas record research, received no permanent eye impairment. His vehicle was damaged in the sum of $2,775.21.
In June 1990, McDaniel filed his complaint in the Circuit Court of Smith County for damages resulting from the collision. McDaniel alleged that at the time of the accident, Ealy was the agent or employee of Guy O. Wilcher (Wilcher) and James W. Sessums Timber Company, Inc. (Sessums), a domestic corporation. McDaniel requested actual and punitive damages.
Sessums, by answer and amended answer, denied that Ealy was its agent, servant, or employee at the time of the accident. It denied the remaining charging parts of the complaint and plead that McDaniel was improperly parked and was, therefore, guilty of contributory negligence.
Wilcher, by answer and amended answer, admitted that at the time of the accident Ealy was his employee, but denied the remaining charging portions of the complaint. Wilcher further alleged that McDaniel was improperly parked and was, therefore, guilty of contributory negligence.
At trial, the evidence established that Georgia-Pacific Corporation (GPC) entered into a timber cutting contract with Sessums "Crew B." The contract provided that Sessums would cut and haul timber from certain GPC tracts; that Sessums would furnish at its own expense all machines, tools, labor and equipment, and had the exclusive right in the management of the contract operation of its independent business; that GPC had no authority to hire, fire, discipline or supervise any Sessums employee. James Sessums, President of the corporate entity, testified that he made an oral agreement with Wilcher whereby Wilcher employed a crew, cut and hauled timber from the tracts designated on the GPC-Sessums contract, and was paid a part of the contract proceeds. Sessums provided all of the equipment used by Wilcher, including trucks, skidders, loader, dozer and a front-end loader. Sessums paid for the truck tags and permits. The truck driven by Ealy at the time of the collision bore large painted signs on its doors which stated: James W. Sessums, 654-3339, Lena, MS. Sessums and Wilcher testified that their oral agreement provided for the lease-purchase of the equipment by Wilcher. Sessums received the GPC contract checks, deducted its portion of the equipment lease purchase monies, and delivered the remaining funds to Wilcher. Crew B was paid by Wilcher, who withheld social security and required taxes. Wilcher provided worker's compensation insurance coverage for the crew.
Although Wilcher and Sessums endeavored to establish an independent contractor relationship, the following testimony of Sessums is revealing:
Q Okay. Now, at the time of the accident that we have been talking about here today, did you have a contract to cut the timber that was on the truck involved in the accident?
A Yes, sir.
Q And that was Georgia-Pacific?
A Yes, sir.
Q Tell us how this contract with Georgia-Pacific worked?
A Well, they, you know, buy a tract of timber, we would agree to haul it for a certain amount of money, that they would, you know, show us a tract of timber and say, now, you go out there and you cut that and deliver it and we'll pay you x number of dollars.
* * * * * *
Q And what you did, you got Guy Wilcher to cut it for you?
A Yes, sir.
Q And when you say your crew, what are you talking about?

*878 A I've got a crew that I'm over.
* * * * * *
Q Now, let's  how many other crews work for James W. Sessums Timber Company, Inc.?
A It's only Mr. Wilcher's crew and my crew now.
* * * * * *
Q Now, this is a cutting and hauling contract between Georgia-Pacific Corporation, hereinafter called G.P.C., and James Sessums, P.O. Box 203, Lena, Mississippi.
A Yes, sir.
Q Crew B?
A Yes, sir.
Q What is Crew B?
A That's the letter that we had give them I'd had other crews before but no longer.
Q Well, whose crew was Crew B?
A Guy Wilcher.
Wilcher testified that he cut and hauled timber for Sessums for a certain amount per ton. He confirmed that Sessums provided the equipment under his oral lease-purchase arrangement. The details of this arrangement, including the rental, were not revealed. Wilcher related that he employed Ealy, who was referred to him by Sessums.
On the morning of the accident, Ealy reported to work at 7:00 a.m. He hauled one load of logs to Taylorsville and returned to the haul site. Wilcher loaded the truck for the second haul designated for Bay Springs. In explanation of his actions of loading the truck so that the log lengths violated statutory prescription, Wilcher stated:
Well, I didn't really  they didn't look that long to me and I was probably rushing things a little, you know, having to run the loader?
* * * * * *
Q Who paid the fine for the over-length load on that truck?
A I did.
Q Why did you pay it?
A Well, I felt like it was my fault they was over-length. I loaded them.
Wilcher denied pre-accident knowledge of Ealy's intoxicated condition.
Ealy, a truck driver for Wilcher, blamed his lack of sobriety on drinking with friends the night before the accident. He admitted that he was arrested and placed in jail as a result of "what was found on the alcohol machine." He further admitted pleading guilty to driving while intoxicated on the occasion.
Evidence was introduced on behalf of Wilcher, Sessums, and Ealy showing that two large yellow "X's" were painted on the pavement adjacent to the repair shop and law office where McDaniel's car was parked.
Upon conclusion of trial proceedings, Sessums moved for a directed verdict on the ground that Wilcher's relationship with Sessums was that of an independent contractor and, therefore, he was not responsible for the agents or employees of Wilcher. The motion was denied. Sessums requested a peremptory instruction which was refused.
Issues of master servant/independent contractor, negligence, liability, punitive damages, and contributory negligence were submitted to the jury.
The jury returned a verdict of $5,000 actual damages and $70,000 punitive damages in favor of McDaniel against Sessums and Wilcher. Sessums and Wilcher moved for a new trial, or alternatively, for a directed verdict as a matter of law on the issue of punitive damages, or in lieu thereof, a remittitur on the issue of punitive damages. Sessums also moved for judgment as a matter of law (JNOV). These motions were overruled and final judgment rendered against Sessums and Wilcher on the jury verdict.
Aggrieved, Wilcher and Sessums appeal contending:
(1) The court erred in submitting the issue of punitive damages to the jury;
(2) The court erred in refusing to grant Sessums a directed verdict at the conclusion of Sessums' case;
*879 (3) The court erred in refusing to grant a mistrial because of remarks made by McDaniel's attorney during closing argument; and
(4) The punitive damage award is excessive.

(1) Was the issue of punitive damages erroneously submitted to the jury?

Wilcher and Sessums contend that the instructions granted by the court on the punitive damage issue were erroneous, because they permitted the jury to return a verdict without proper guidance. No authority is cited for their argument. We adhere to the rule that it is not necessary for this Court to address an appellate issue unsupported by authority. R & S Development, Inc. v. Wilson, 534 So.2d 1008, 1015 (Miss. 1988); Devereaux v. Devereaux, 493 So.2d 1310, 1315 (Miss. 1986). Pretermitting application of the precept, however, would not result in an appellate ruling favorable to Wilcher or Sessums. The instructions do not misstate the law. One properly states the law applicable to the defendant's liability for violation of the statutory prohibition against over-length loads, if such violation proximately contributed to the accident. The other properly instructed the jury on proof prerequisite to punitive damage awards. These instructions, taken out of case context, and without consideration of the other instructions granted by the trial court, might indicate to the casual reader something was amiss or lacking. Such is not the case. On appeal, these two instructions may not be singled out and used as a basis for reversal on the grounds that they do not provide proper jury guidance. The instructions granted by the trial court must be considered as a whole. Moreover, defendants Sessums and Wilcher obtained two punitive damage instructions properly setting forth the standard of conduct prerequisite to a punitive damage award. These instructions informed the jury that even if facts warranting punitive damages existed, the jury was not required to award such damages. The instructions taken as a whole fairly announce the applicable law. Caruso v. Picayune Pizza Hut, Inc., 598 So.2d 770, 776 (Miss. 1992); Purina Mills, Inc. v. Moak, 575 So.2d 993 (Miss. 1990); Rester v. Lott, 566 So.2d 1266 (Miss. 1990); Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35 (Miss. 1989); Detroit Marine Engineering v. McRee, 510 So.2d 462 (Miss. 1987); Woolfolk v. Tucker, 485 So.2d 1039 (Miss. 1986).
Wilcher and Sessums make a weak argument challenging the sufficiency of the evidence to warrant submission of the punitive damage issue to the jury. Again no authority is cited for their position. Our pronouncements concerning a driver's intoxication which is a proximate contributing cause of an accident resulting in injuries is well known to bench and bar. In Magrew v. State, 469 So.2d 95, 97 (Miss. 1985), we stated:
Although intoxication within itself is not the ultimate question in a culpable negligence suit, it may be considered as an element constituting gross and careless disregard for the value of human life.
Miss. Code Ann. § 63-11-30 (Supp. 1990) in effect at the time of the accident provided:
It is unlawful for any person to drive or otherwise operate a vehicle within this state who ... has ten one hundredths percent (.10%) or more by weight volume of alcohol in the person's blood based upon milligrams of alcohol per one hundred (100) cubic centimeters of blood as shown by a chemical analysis of such person's ... blood... .
The evidence in this case shows without dispute that Ealy had a blood alcohol content level of .24% at the time of the collision. It is common knowledge that such content necessarily impaired his driving ability, and contributed to the collision. In Allen v. Blanks, 384 So.2d 63, 67 (Miss. 1980), we stated:
It is a fact capable of judicial notice that consumption of even small quantities of alcohol may significantly, albeit, "imperceptively" impair reaction time. Where split seconds are critical, even a very slight impairment of reaction may spell the difference between an accident or no accident between proximately contributing negligence or the lack of it.
We are not called upon to relate how much one's reaction time is impaired by an alcohol blood content of .24%. We do, however, *880 express our regard for the established social policy prohibiting one from driving a vehicle on our public highways while in an intoxicated condition. A primary purpose in imposing punitive damages is to punish one engaging in grossly negligent conduct and to serve as a warning to such person and others not to engage in similar conduct in the future. See Southland Broadcasting Company v. Tracy, 210 Miss. 836, 847, 50 So.2d 572, 576 (1951). See also Intoxication of Driver as Basis for Awarding Punitive Damages, 65 A.L.R.3d 656 (1975).
There is no merit in this assigned error.

(2) Did the trial court err in refusing to grant Sessums a directed verdict?

Sessums urges that the trial court should have granted it a directed verdict upon conclusion of McDaniel's case. It does so on the sole premise that Wilcher was an independent contractor and therefore Sessums may not be vicariously liable for Ealy's negligence via respondeat superior.
Any error by the trial court in denying Sessums' motion for directed verdict upon close of McDaniel's case was waived when Sessums introduced evidence in its own behalf. See Comment to M.R.C.P. 50 and cases cited. The effect of this waiver, however, is explained in Clements v. Young, 481 So.2d 263, 268 (Miss. 1985):
Because it is often misunderstood, this point requires comment. By offering evidence of his own, the defending party in no way waives the right to challenge the sufficiency or weight of the evidence in the event of an adverse judgment. What the waiver rule means is he must proceed on the basis of the evidence before the court at the time the challenge is made and not in the limited state in which it may have been back when the motion to dismiss was made.
Put otherwise, all of these motions  the motion to dismiss, the motion in a jury trial for a directed verdict made at the end of the plaintiff's or movant's case, as well as the request for a peremptory instruction at the end of all of the evidence or a motion for judgment notwithstanding the verdict thereafter, are procedural vehicles for challenging the sufficiency of the plaintiff's or movant's case. Each requires that the court consider all of the evidence before it at the time the motion is offered.

The sufficiency of McDaniel's evidence must, therefore, be considered on the basis of all the evidence offered, and the court's ruling tested under its denial of Sessums' request for a peremptory instruction and motion equivalent for JNOV. We articulated our familiar and well settled scope of review in Weems v. American Sec. Ins. Co., 450 So.2d 431, 435 (Miss. 1984):
The request for a peremptory instruction or the subsequent motion for a judgment notwithstanding the verdict tests the legal sufficiency of the evidence supporting the verdict. Either asks the court to hold, as a matter of law, that the evidence is insufficient to support a verdict in favor of the non-movant. Where such a request has been made, the trial court must consider all of the evidence  not just the evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. See, e.g., General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983).
Sessums contends the evidence was insufficient to make a jury issue of respondeat superior. Leaf River Forest Products, Inc. v. Harrison, 392 So.2d 1138 (Miss. 1981) is relied upon as the authoritative source for the assertion. In Leaf River, a contract was *881 entered into between Charles McDonald and Leaf River whereby McDonald agreed to cut timber and haul the logs of Leaf River for a certain per ton price. Their written contract, similar to the GPC-Sessums contract in this case, specifically set out the respective rights and obligations of the parties, and negated any right of control by Leaf River over the time, manner, or method of the work to be performed by McDonald. McDonald owned and operated his own equipment, including trucks, trailers, loaders, skidders, saws and related items. McDonald contracted with other timber owners for the purpose of cutting and hauling their logs. A truck driver of McDonald was involved in a vehicular collision with Harrison, who sued Leaf River alleging McDonald and the truck driver were its employees and, therefore, liability ensued via respondeat superior. We reversed the trial court's action in submitting the issue of Leaf River's liability to the jury because the significant facts required holding that McDonald was an independent contractor. We confirmed the tests and factors delineated in Kisner v. Jackson, 159 Miss. 424, 428-29, 132 So. 90 (1931), for determining whether one is an independent contractor or employee. In Kisner, we stated:
There are several tests to be applied, the weight of each, and whether much or little, rising and falling in the scale as it may or may not be counterbalanced by one or more of the remaining tests, present in the particular case in hand. For this reason these tests cannot be stated in any precise order of importance, but they are as follows: Whether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; whether he is obliged to pay the wages of said employees.
159 Miss. at 428-90, 132 So. at 91.
In this case the following significant facts distinguish it from Leaf River:
(a) The contract between GPC and Sessums stated that the contracting parties were Sessums' "Crew B";
(b) James Sessums, president of the corporate entity, testified "Crew B" was Wilcher's crew;
(c) James Sessums admitted in his testimony that his crew and Wilcher's Crew B were the only crews "working for Sessums";
(d) Sessums furnished all the equipment for the work including the truck driven by Ealy at the time of the collision;
(e) Sessums collected and controlled all contract proceeds from GPC, and deducted its part, before delivering the remaining proceeds to Wilcher;
(f) Sessums paid the taxes and permits for the truck driven by Ealy;
(g) Sessums-Wilcher had no formal written contract specifying or limiting their relationship;
(h) No explanation of the details of the equipment lease-purchase arrangement was given by Sessums or Wilcher;
(i) The truck driven by Ealy bore signs indicating that it belonged to, and was the property of, Sessums.
While Sessums urges an independent contractor relationship with Wilcher, we believe the proof is sufficient to sustain the trial court's action in submitting the issue for jury resolution. We cannot say that the facts and inferences point so overwhelmingly in favor of Sessums that reasonable men could not have arrived at a contrary verdict. There is no merit in this issue.

*882 (3) Impropriety of Closing Argument

Sessums and Wilcher also seek reversal on the basis of alleged improper closing argument by McDaniel's attorney. Shell Oil Co. v. Pou, 204 So.2d 155 (Miss. 1967), is cited as authority for their contention. In Shell Oil Co., the evidence was insufficient to support a jury verdict awarding punitive damages, requiring reversal. The case was close on liability for actual damages. In reversing, we observed that the trial court's error in submitting the punitive damage issue to the jury was compounded when Pou's counsel in his closing argument "was permitted over objection, to state, after reading the instruction of the court authorizing the award of punitive damages, that the defendant was a corporation, had no soul, could neither go to heaven nor hell and that the way that the law punishes a corporation for not paying their debts in a case like this, if you find that they owe actual damage, is to require them to pay a punitive damage."
The facts of Shell Oil Co. are distinguishable from those in this case. First, the trial court in this case sustained objections to portions of the closing argument by McDaniel's attorney and admonished the jury to disregard them. Second, the trial court's action in submitting the punitive damage issue to the jury in this case was clearly proper. The record shows without dispute a vehicular collision proximately caused by a drunk driver operating a log truck on a main thoroughfare with an over-length load of logs, all in violation of state statutes enacted to protect the traveling public. Some latitude must be accorded an argument based on such flagrant statutory violation and misconduct. While an attorney making a closing argument may not make remarks which are unfairly calculated to arouse passion or prejudice, and while we do not condone appeals to sectional prejudices of the jury, the control of such argument is left largely to the discretion of the trial judge, who is in a much better position to observe and determine what is improper.
A careful reading of the record in this case confirms no abuse of discretion by the trial judge on this assigned issue. See General Motors Acceptance Corp. v. Layton, 353 So.2d 749, 754 (Miss. 1977).

(4) Were punitive damages excessive?
It is next asserted that the punitive damage award is excessive. The proof in this case establishes that the net worth of Wilcher and Sessums are at least:
Sessums  $88,998.24;
Wilcher  $27,900.00.
The record reflects that Wilcher's net worth may exceed the stated amount because of his possible equity in the lease-purchase equipment. The value of such equity, if any, was not made certain in monetary terms. Special circumstances existing in this case relieve us of any duty to examine the Wilcher-Sessums net worth. During trial and cross-examination of Sessums, McDaniel's attorney sought to adduce evidence pertaining to Sessums' responsibilities for all harvesting operations under the GPC contract. Sessums' attorney objected to the examination unless questions were placed in contract context. The following then occurred:
MR. EASTERLING: I have no objection to the contract being put in, but I do object to him just reading the contract out of context 
Q Out of context, I'm reading verbatim.
MR. EASTERLING: And  there aren't any questions other than is this what it said, so, if he wants to do that, just put it in evidence.
* * * * * *
Q All right, if there is no objection then, Your Honor, we will have it introduced in evidence as part of this witness' testimony.
THE COURT: Okay.
* * * * * *
WHEREUPON SAID CONTRACT WAS MARKED EXHIBIT P-16 TO THE TESTIMONY OF JAMES W. SESSUMS, IT WAS RECEIVED IN EVIDENCE ...
The contract, placed in evidence with the full knowledge, permission, and consent of Sessums' attorney, contains the following provision:

*883 12. During the term of this agreement, contractor will maintain the following insurance with a carrier acceptable to GPC:
(c) Motor vehicle insurance on all motor vehicles used in the operation (including owned, non-owned and hired) of an amount not less that $100,000 for any one person, $300,000 per accident, and property damage insurance in the amount of $100,000.
Prior to beginning performance hereunder, contractor shall submit to GPC certificates from insurance carrier showing the above insurance coverages to be in full force and effect in connection with ... automobile insurance. Such certificates shall recognize and accept the contractual liability imposed upon and accepted by contractor under this agreement.
The record before this Court reveals that the truck involved in the accident is insured by a liability insurance policy providing single limits coverage of $500,000. Neither party alluded to these contract provisions during trial or in the appeal briefs. Under previous pronouncements of this Court, such coverage provides a source from which a punitive damage award may be paid. Old Security Cas. Co. v. Clemmer, 455 So.2d 781, 783 (Miss. 1984); Anthony v. Frith, 394 So.2d 867, 868 (Miss. 1981). The record indicates that the proof of net worth of the two defendants was not fully developed, however, the net worth of the defendants combined with the insurance coverage carried by Sessums in conformance with the GPC-Sessums contract supports the jury's award. Under the facts and applicable law, this assignment is devoid of merit.
Finding no merit to the assigned errors, we affirm.
AFFIRMED.
SULLIVAN, BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.
DAN M. LEE, P.J., concurs in result only.
HAWKINS, C.J., dissents with separate written opinion joined by PRATHER, P.J., and SMITH, J.
HAWKINS, Chief Justice, dissenting:
I respectfully dissent. I would grant the petition, and enter a substantial remittitur based on the net worth of Sessums of $89,000 and Wilcher of $28,000.
As Anthony v. Frith, 394 So.2d 867, 868 (Miss. 1981), noted, there is a respectable body of authority in this country holding it is against public policy for a liability insurance policy to cover punitive damages. The reason for this is that punitive damages are to punish the wrongdoer, and having an insurance policy covering this very contingency is close kin to having an insurance policy that will pay all fines assessed against you. Obviously, the raison d'etre for punitive damages is emasculated if its infliction causes no hurt, no pain to the wrongdoer.
In Anthony v. Frith we simply took the view that there is no public policy against an insurance policy by its language covering punitive damages. As the author of that opinion, I saw grave ethical problems which might confront a lawyer during trial defending an insured in the absence of clear language in the policy excluding punitive damages. See also Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255 (Miss. 1988). Nothing in Anthony v. Frith implied that a liability insurance carrier was required to cover punitive damages along with compensatory damages, and in Old Sec. Cas. Ins. Co. v. Clemmer, 455 So.2d 781 (Miss. 1984), we clearly held the policy could exclude punitive damages.
In this case we do not know whether James W. Sessums Timber Company, Inc., or Guy O. Wilcher actually had an insurance policy in effect or not. A contract between Sessums and a timber corporation was introduced showing that Sessums was contractually obligated to that corporation to carry a $500,000 liability insurance policy, and a contract between Sessums and Wilcher was introduced into evidence showing Wilcher was obligated to carry a $100,000 liability insurance policy. Whether either carried such a policy or indeed any policy, in fact, is not shown. And assuredly, it is not shown whether either of them carried insurance against punitive damages.
*884 Yet here we have the majority, with nothing in the record nor any argument on appeal to support it, leaping to the conclusion such punitive damage liability was in effect, and that the jury had the right to consider it in existence, and take the amount of such "supposed" insurance into consideration in assessing punitive damages.
Beyond this, there is a vast and major chasm that the majority wreaks in the whole concept of punitive damage law when it holds that it is proper for a jury to consider liability insurance coverage in assessing punitive damages. Of what effect is the purpose of punishment when there is none, a liability policy covers it all?
It is improper for a court, much less a jury, to consider liability insurance along with net worth in assessing punitive damages. In Liberatore v. Thompson, 157 Ariz. 612, 760 P.2d 612 (Ariz. App. 1988), the net worth of the defendant was $38,000, and the jury awarded $500,000 in punitive damages. The trial court found the award excessive and ordered a new trial. On appeal, the plaintiff argued the court should have considered the defendant's liability insurance coverage. The Arizona Court of Appeals disagreed:
Plaintiff argues ... that any disproportion between the defendant's wealth and the punitive damage award should be disregarded because the defendants have insurance. We reject that argument. It is the defendant's own wealth, not his insurer's wealth, that bears on the proper level of punitive damages. Punitive damages are premised on the jury's expectation, sometimes a fiction, that the defendant himself will bear the punitive sting. We will not observe that premise to support the concept of punitive damages but abandon it to preserve a disproportionate award on the theory that "the defendant won't have to pay it anyway."
Liberatore v. Thompson, 760 P.2d at 621.
As the facts in this case show, there has been enough stretching of credulity to award punitive damages in any amount. I can, barely, go along with an instruction authorizing the jury to consider punitive damages, but cannot with the violence the majority does to punitive damage law. Untroubled by lack of precedent, the majority simply legislates a new law which, insofar as the majority enlightens us, has never before been advocated by case law or any other respectable authority.
I apprehend that the majority has thrown fodder to those who want to do away with punitive damages altogether in our Legislature or the United States Supreme Court. Long-established concepts and justification for punitive damages have just been shown to be irrelevant.
PRATHER, P.J., and SMITH, J., join this opinion.