# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-01952-SCT

*J. S. PURDON, M.D. AND J. S. PURDON, M.D., P.A.*

*v.*

*LARRY LOCKE AND RITA LOCKE*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/30/1999 |
| TRIAL JUDGE: | HON. JOHN L. HATCHER |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT K. UPCHURCH |
| | DAVID W. UPCHURCH |
| ATTORNEYS FOR APPELLEES: | RALPH EDWIN CHAPMAN |
| | DANA J. SWAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 10/11/2001 |
| MOTION FOR REHEARING FILED: | 11/13/2001; denied 2/21/2002 |
| MANDATE ISSUED: | 2/28/2002; corrected 6/27/2002 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. On August 17, 1993, Larry Locke and Rita Locke (Lockes) filed a medical malpractice complaint in the Circuit Court of Quitman County against J. S. Purdon, M.D.; J. S. Purdon, M.D., P.A. (Purdon); Baptist Memorial Hospital-North Mississippi (Baptist); and C. R. Bard, Inc. (Bard). On March 17, 1994, the Lockes filed an amended complaint adding Devices for Vascular Intervention (DVI) as a defendant. The complaint alleged that Larry Locke suffered personal injury as a result of a guide wire manufactured by Bard breaking during a directional coronary atherectomy performed by Purdon and that the athrocath used by Purdon during the procedure was negligently manufactured by DVI. In addition, Rita Locke separately sought damages for loss of consortium.

¶2. On April 29, 1994, DVI had the case removed to the federal court for the Northern District of Mississippi, Delta Division. At first, the Lockes filed a motion to remand the case back to state court, and that motion was denied. Then, the Lockes apparently agreed to a settlement with Bard and DVI, and on August 24, 1995, an agreed order dismissing the claims against Bard and DVI was entered. In addition, sometime later, the Lockes settled their claims against Baptist, and an order dismissing those claims was duly entered.

¶3. On December 28, 1998, the United States District Judge remanded the case to state court. Purdon subsequently filed a motion for change of venue which was denied. Finally, on June 14, 1999, a trial in the Circuit Court of Quitman County began. Purdon alleges several defects within the trial that shall be discussed under the relevant assignment of error. After some initial confusion (the jury had not determined a dollar figure as damages, only a percentage), the jury returned a verdict in favor of the Lockes. Pursuant to

the jury verdict, judgment was entered on July 6, 1999, in the amount of $650,000 ($500,000 for Larry Locke and $150,000 for Rita Locke).

¶4. At that time, Purdon filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial or a remittitur. A hearing was conducted, and an order was entered denying the motion. In response, Purdon filed a timely appeal alleging that (1) he is entitled to a remittitur or a new trial on the damages as legally excessive because the jury verdict evinces bias, passion, and prejudice; (2) the trial court erred in denying his motion in limine to exclude Mr. Locke's medical bills; (3) the trial court erred in denying his motion for directed verdict as to Mrs. Locke's claim and in granting jury instruction P-7; (4) the trial court erred in granting jury instruction P-5; and (5) the trial court erred in denying his motion for directed verdict as to Mr. Locke's medical negligence claim.

## FACTS

¶5. Originally, Larry Locke sought the services of Dr. Timothy Wright, a cardiologist, for a lingering chest pain and shortness of breath. An exercise treadmill test indicated a coronary artery blockage, but further testing was needed to accurately determine the extent of the blockage. Mr. Locke was scheduled to return. However, on June 8, 1992, Locke went to the Baptist emergency room in Oxford, Mississippi, complaining of chest pains. At that time, Dr. Wright performed a cardiac catherization which revealed extensive arterial blockage.

¶6. Dr. Wright consulted with Purdon, his partner, and Dr. Robert Derveloy, a cardiac surgeon. According to Purdon, the doctors felt that a coronary artery bypass graft surgery was appropriate, but Mr. Locke elected instead to undergo a percutaneous transluminal coronary angioplasty (PTCA - a procedure in which a balloon-tipped catheter is inserted and inflated to widen the blocked artery) and a directional coronary atherectomy (DCA - a rotary device to cut through the plague blockage). Mr. Locke gave informed consent to undergoing the procedures, which Purdon alleges included the possibility of an emergency bypass.

¶7. On June 11, 1992, the procedure in question was performed, and sometime during the course of matters, a piece of the guide wire broke off inside Locke's artery. Purdon changed his version of the events several times. At first, he said that the guide wire broke. Then, Purdon claimed that he cut the wire, despite all evidence to the contrary. Finally, he reversed his position again and claimed that the wire broke due to a malfunction of the mechanism. In any case, Locke was immediately transferred to surgery where Dr. Derveloy surgically removed the wire fragment and performed a bypass. Despite Purdon's denials, the evidence from the operating nurse and surgical notes indicates that Purdon went into the operating room and took the fractured wire after Dr. Derveloy performed the surgery to remove the wire. The wire fragment was never recovered. Finally, on June 17, Locke was discharged from the hospital.

¶8. At trial, Locke testified of soreness and extreme discomfort; furthermore, he complained of emotional instability following the surgery that has affected his relationship with his wife. In addition, other testimony at trial, namely from Rita Locke, suggests that Larry Locke's attitude and personality have suffered since his surgery. Locke garnered approximately $47,000 in medical bills, although he had not paid them at the time of trial and they were later significantly adjusted. After trial, a jury returned a verdict in favor of the Lockes in the amount of $650,000; Purdon now appeals that judgment.

## DISCUSSION

**I. WHETHER PURDON IS ENTITLED TO A REMITTITUR OR A NEW TRIAL ON THE DAMAGES AS THEY ARE LEGALLY EXCESSIVE BECAUSE THE JURY VERDICT EVINCES BIAS, PASSION, AND PREJUDICE.**

¶9. We proceed on a case-by-case basis in determining whether a jury award is excessive. ***Biloxi Elec. Co. v. Thorn***, 264 So. 2d 404, 405 (Miss. 1972). In truth, a jury verdict can be so excessive as to evince bias, passion, and prejudice; however, we have stated a very high standard of review.

> The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, where they have no standard by which to ascertain the excess.

***Detroit Marine Eng' v. McRee***, 510 So. 2d 462, 471 (Miss. 1987) (citing ***Biloxi Elec.***, 264 So. 2d at 405). Furthermore, "[t]he only evidence of corruption, passion, prejudice or bias on the part of the jury is an inference, if any, to be drawn from contrasting the amount of the verdict with the amount of damages." ***Biloxi Elec.***, 264 So. 2d at 406. Evidence is viewed in the light most favorable to the verdict and all reasonable inferences are given thereof. ***Odom v. Roberts***, 606 So. 2d 114, 118 (Miss. 1992). In essence, we will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, "shocks the conscience." ***City of Jackson v. Locklar***, 431 So. 2d 475, 481 (Miss. 1983).

¶10. In ***James v. Jackson***, 514 So. 2d 1224 (Miss. 1987), we enumerated the elements of damages which must be examined for evidence of bias. They are (1) past and future pain and suffering; (2) past and future medical expenses; (3) lost wages; and (4) future disability. *Id.* Purdon argues that Locke introduced evidence of a mere one-year of present physical pain and none as to future pain. Purdon also theorizes that since Locke underwent a second bypass surgery in December 1998, his emotional distress is limited by this fact. Also, as Locke points out, the issue of future pain was dropped along with the instruction describing the same. Locke counters Purdon's argument by asserting that ample evidence exists to support physical pain and emotional distress. As for medical expenses, Locke introduced medical bills totaling $45,721.29. Purdon objected to the introduction of these bills but raises the denial of his motion as a separate assignment of error, so we shall wait to address that issue. Finally, there was no claim as to lost wages or future disability, so those too are non-issues.

¶11. In addition to asserting that the elements of damages do not justify an award of $500,000 (oddly, Purdon makes only a cursory argument against the award as to Rita Locke), Purdon also points to various statements throughout the trial, that he claims, evince bias and prejudice. Among the alleged improper statements, the phrase "that is a loaded question", made by a juror during voir dire and reiterated by the judge, has been indicated as evidence of bias. However, Locke points out that Purdon did not object to the comments or strike the juror in question. He also had every opportunity to further question the jurors and clarify the matter. As further evidence of alleged prejudice, Purdon contends that Lockes' counsel made inflammatory remarks during closing arguments, such as paralleling damages to punishing an unruly child by "whoop him (Purdon) until you broke your belt" and suggesting that Purdon would return to Oxford and brag that "I showed them over in Quitman County". On this point, Purdon's argument contains two fatal flaws. First, the propriety of closing arguments is left to the sound discretion of the trial judge, and only an abuse of discretion will warrant second-guessing his decision. ***James W. Sessums Timber Co. v. McDaniel***, 635 So. 2d 875, 882 (Miss. 1994). Second, as with the other statements, Purdon could have

objected or otherwise rectified the problem. Purdon chose not to do so, and these small statements alone do not prove a verdict based on prejudice.

¶12. Finally, Purdon ventures to equate his case with several previous holdings by this Court. First, Purdon cites *Wells Fargo Armored Serv. Corp. v. Turner*, 543 So. 2d 154 (Miss. 1989) in support of remittitur. In that case, we reduced the plaintiff's recovery from $3,461,082 to $850,000. Purdon argues that the damages in *Wells Fargo* were considerably more extensive and debilitating then those evidenced in the case sub judice, and if that case required remittitur, then the present award is far too extensive. As previously stated, jury awards are examined on a case-by-case basis. *Biloxi Elec.*, 264 So. 2d at 405. In *Wells Fargo*, at least three million dollars of the jury award was allotted for pain and suffering. In that particular case and under those particular circumstances, this Court felt the $3,000,000 award to be too excessive. In the present case, around $450,000 represent pain and suffering, and at first blush, such a figure does not shock the conscience. In addition, Purdon cites *Rawson v. Mid-South Rail Corp.*, 738 So. 2d 280 (Miss. 1999), in which we affirmed a remittitur of $112,500 from a $187,500 judgment granted by the trial judge. However, when deciding on the propriety of a trial judge's ruling, we apply an abuse of discretion standard. *Sessums Timber Co.*, 635 So. 2d at 882. Thus, although *Rawson* dealt with a remittitur, the holding actually supports the judge's denial of Purdon's motion in the instant case. The trial judge is in a much better position to decide whether the evidence and testimony support a jury award. Per our charge, we give the verdict all favorable inferences. As such, we find no abuse of discretion by the trial judge, as well as no evidence that would require us to label the present jury award as exorbitant.

## II. WHETHER THE TRIAL COURT ERRED IN DENYING PURDON'S MOTION IN LIMINE TO EXCLUDE MR. LOCKE'S MEDICAL BILLS.

¶13. As his next assignment of error, Purdon argues that the trial court abused its discretion in denying his motion in limine to exclude Larry Locke's medical bills. Purdon contends that since Locke had not paid the bills, they were not properly damages sustained by him. In addition, a portion of the bills ($29,971.29) were written off by Baptist, which Purdon believes makes them inappropriate as an item of damages. At the least, Purdon feels that he should have been allowed to call Claire Pulliam, as a representative of Baptist, to testify that the bill was indeed written off. Furthermore, Purdon argues the cost of the DCA procedure should be deducted as it was a necessary operation for which Locke could not live without and is therefore not causally connected to the injury. *See Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993). Since Locke would have had to pay for it even if the injury had not occurred, Purdon believes it should not be listed as an element of the damages. Finally, if Locke is able to collect on bills he has not paid, Purdon contends that the very idea of compensatory damages will be violated. "Compensatory damages are such damages as will compensate the party for the injury sustained, and nothing more: such as will simply make good or replace the loss caused by the wrong or injury." *Richardson v. Canton Farm Equip., Inc.*, 608 So. 2d 1240, 1250 (Miss. 1992).

¶14. Locke rebuts this contention by pointing out that the Miss. Code Ann. § 41-9-119 (2001), the statute governing the reasonableness of medical bills, simply states that "[p]roof that medical, hospital, and doctor bills were paid **or incurred** because of any illness, disease, or injury shall be prima facie evidence that such bills so paid **or incurred** were necessary and reasonable." (Emphasis added). There is no doubt that demands for payment were delivered to Locke and thus, incurred by him. Thus, the jury was properly allowed to hear them.

¶15. The burden became Purdon's to show that the bills were not reasonable. In ***Green v. Grant,*** 641 So. 2d 1203, 1209 (Miss. 1994), this Court held that the opposing party, in this case Purdon, must present proper evidence in order to rebut the necessity and reasonableness of the bills incurred. After Locke put on evidence of the bills incurred, the burden shifted to Purdon to rebut the reasonable of the bills incurred. Purdon did not introduce any proper evidence to rebut the reasonableness of the bills. In fact, he introduced no evidence before the jury to rebut the reasonableness of bills. Mrs. Pulliam was not allowed to testify regarding her knowledge of bills "written off" because her testimony was properly ruled to be inadmissible hearsay. The only evidence Purdon complains of being excluded was the testimony of Ms. Pulliam and that evidence was not proper. Since the only evidence Purdon complains of being excluded was the testimony of-Ms. Pulliam and we have already established that bills merely have to be incurred to be introduced, this assignment of error is without merit. The trial judge did not abuse his discretion in denying the motion in limine.

### III. WHETHER THE TRIAL COURT ERRED IN DENYING PURDON'S MOTION FOR DIRECTED VERDICT AS TO MRS. LOCKE'S CLAIM AND IN GRANTING JURY INSTRUCTION P-7.

¶16. Purdon's next contention is that his motion for a directed verdict should have been granted as no evidence was introduced to prove that as a result of her husband's injuries, she suffered a loss of consortium. *See **Tribble v. Gregory***, 288 So. 2d 13, 17 (Miss. 1974). In the alternative, Purdon argues that the evidence did not support P-7, the loss of consortium instruction. *See **DeLaughter v. Lawrence County. Hosp.***, 601 So. 2d 818, 824 (Miss. 1992). In essence, Purdon suggests that there is insufficient evidence to support the jury's verdict.

¶17. As we have already discussed the standard of review applied to jury verdicts as well as trial judge's rulings, we need not reiterate the tests here. Put simply, testimony and evidence were properly introduced and evince a serious decline in the Lockes' relationship subsequent to the injury. Larry Locke testified that he was very sore and had to sleep a few nights in a recliner. When he was discharged, the doctor told him not to lift anything and to take it easy; he continues to have problems with lifting anything heavy. He testified that he has bad nightmares and could not control his emotions. Because of his mood swings, he had to take nerve pills and sleeping pills. Mr. Locke testified that he suffers emotional instability and this has affected his relationship with his wife. From this testimony, it is reasonable for the jury to infer loss of spousal assistance and affection.

¶18. Rita Locke testified that before his surgery, her husband was outgoing, friendly, caring, and enjoyable to be around. After the surgery, she testified that for a long period of time he would get upset with her and the kids and frustrated because he could not do the things he could before. According to Mrs. Locke, her husband complained about pain and had trouble sleeping. He would sleep in the chair a lot and he did not care to be around her as much. This emotional and physical change in behavior, she testified, adversely affected her relationship with her husband. From the testimony given by Mrs. Locke, it was reasonable for the jury to infer that her relationship with her husband was adversely affected. Although there were limited direct questions concerning the-couple's relationship, Giving the verdict all favorable inferences from all of the evidence, in the record adequately supports the loss of consortium instruction, which certainly makes the denial of the motion for directed verdict within the trial judge's discretion.

### IV. WHETHER THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTION P-

**5.**

¶19. This assignment of error is a simple rewording of the argument made under Issue I concerning present and future pain and emotional distress. Essentially, Purdon is claiming that there is insufficient evidence to support an instruction on calculating damages that contains the elements of present and future pain and suffering as well as emotional distress. He further argues that instructions should only contain those elements for which there is supporting evidence. *See DeLaughter*, 601 So. 2d at 824.

¶20. As before, we find ample evidence to support the award and give deference to the jury. In addition, Purdon failed to object to the instruction. It is a well-settled fact that failure to object to an instruction is tantamount to waiver of that issue. *Creil v. General Motors Corp.*, 233 So. 2d 105 (Miss. 1970). We have already addressed this issue and accordingly, find this assignment of error to be without merit.

## V. WHETHER THE TRIAL COURT ERRED IN DENYING PURDON'S MOTION FOR DIRECTED VERDICT AS TO MR. LOCKE'S MEDICAL NEGLIGENCE CLAIM.

¶21. Again, through this assignment of error, Dr. Purdon is essentially asking this Court to second-guess both the jury and the trial judge. Although Purdon raises several new factual points regarding the elements of medical negligence that he has yet to raise and calls into question some testimony offered by the Lockes, the standard is still the same. The jury and, subsequently, the trial judge examined the evidence from a much better vantage point than we and found Purdon liable for Mr. Locke's injuries. Despite Purdon's attempts to the contrary, a review of the record, giving the verdict all favorable inferences, shows ample justification for the jury's decision and no abuse of discretion by the trial judge. As such, we find this issue without merit.

## CONCLUSION

¶22. All of Purdon's assignments of error can be boiled down to one simple statement: Purdon believes the jury award was excessive and unsupported by the evidence, and he believes the trial judge abused his discretion in letting the verdict stand. As has been discussed at length, Purdon failed to overcome the burden of proof before him, both overall and as to each issue. Accordingly, we will neither overturn the jury verdict and award nor the rulings of the trial judge. Therefore, the judgment of the Quitman County Circuit Court is affirmed.

¶23. **AFFIRMED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., AND EASLEY, J., CONCUR. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND COBB, JJ. WALLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND COBB, JJ. SMITH, J., JOINS IN PART.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶24. I agree with the majority that Locke was properly allowed to recover for his past medical expenses even though he had not yet paid the bills. However, I disagree with the majority's conclusion that, in addition to the amount of the bills for which Locke remained liable, the portion of the bills which were written off by the hospital were likewise recoverable by Locke.

¶25. In holding that Locke may recover even the portion of the bills which were written off, the majority relies upon Miss. Code Ann. § 41-9-119 (2001), which provides that "[p]roof that medical, hospital, and doctor bills were paid or **incurred** because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or **incurred** were necessary and reasonable." (emphasis added). The majority fails to recognize that no one is responsible for making payment for the written-off portions of the medical bills; therefore, the written-off portions were not incurred by Locke. *See* Webster's Third International Dictionary 1146 (1976) (defining "incur" as "to be liable for").

¶26. A plaintiff is entitled to be made whole by recovering compensatory damages for actual loss sustained. Since no one, including the plaintiff, has paid or is liable for the amount of the bills written off, they do not represent an actual expense incurred. A fundamental principle of the law of damages is compensation for injuries sustained. *McDaniel Bros. Constr. Co. v. Jordy*, 195 So. 2d 922, 925 (Miss. 1967). To allow the plaintiff to recover the amounts written off is to award him a windfall, not compensation.

¶27. For this reason, I respectfully concur in part and dissent in part.

**MILLS AND COBB, JJ., JOIN THIS OPINION.**

**WALLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶28. I concur with the majority's opinion to affirm the trial court on all issues as to the husband, Larry Locke. However, I respectfully dissent from the majority's conclusion that the trial court properly denied Purdon's motion for directed verdict as to Rita Locke's claim for loss of consortium for failing to prove a decline in the relationship and any damages to the relationship.

¶29. The trial court granted Rita Locke's jury instruction for loss of consortium, which authorized the jury to award damages on proof of:

   a. Any loss of society, companionship, love, and affection;

   b. Any loss of aide, services, and physical assistance provided by the husband;

   c. Any loss of participation together in the activities, duties, and responsibilities of making a home.

¶30. On direct examination, Rita Locke gave very generalized responses to questions concerning these elements, as follows:

   Q. After he had gotten home after this happened over at Baptist, how was he then?

   A. He would get really frustrated because he wasn't able to do what he had been doing, and he just didn't know how to deal with that. He would get really upset with us, and we didn't understand why.

   Q. All right. Did you observe any changes in his emotions?

   A. Yeah. He would get really-- I don't know how you would say it, just really loud to us and just get really upset, and I could see that he would have tears, and then he would just go into the room, his room, in our room.

   ******

Q. And during that time frame, did it have any effect on your relationship with him; that is, the way the two of you got along with each other?

A. Yes, it did. He just-- he became, like, I don't know, angry and bitter and just kind of pushed us to the side, like. He didn't care to be around anybody and just stayed-- tried to stay a lot to himself.

¶31. I respectfully disagree with the majority's assertion that this evidence "evinces a serious decline in the Lockes' relationship subsequent to the injury." The testimony presented by Rita Locke at trial describes the effect of her husband's injuries on **his** emotions and temperament, but it did not establish any of the crucial elements of the damage **she** suffered personally as a result of his injuries, such as mental anguish, lack of sexual and intimate relations, and strains on homemaking responsibilities after her husband's injury.

¶32. In loss of consortium cases the plaintiff must establish separate and distinct damages which resulted from injury to his or her spouse to receive compensation. In *Alldread v. Bailey*, 626 So. 2d 99, 102 (Miss. 1993), this Court quoted *Anderson v. Mutert*, 619 S.W.2d 941, 945 ( Mo. Ct. App. 1981), as follows:

a cause of action accruing to a party for loss of consortium is separate and distinct from that party's spouse suffering personal injury. The spouse seeking compensation for loss of consortium must show that he or she suffered damages arising out of the other's injuries....

¶33. On direct, Rita Locke did not provide any information concerning specific damages she suffered, or specific incidents in which her conjugal rights were destroyed as a result of her husband's injury. To the contrary, on cross-examination, she characterized her husband's detachment by stating that prior to his injury "he was always really strong. He just kept everything to himself."

¶34. In the absence of sufficient evidence of damages, I would reverse and render in favor of Purdon as to Rita Locke's loss of consortium claim.

¶35. For these reasons, I respectfully concur in part and dissent in part.

**MILLS AND COBB, JJ., JOIN THIS OPINION. SMITH, J. JOINS IN PART.**