# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-02208-SCT

*DELTA REGIONAL MEDICAL CENTER*

*v.*

*MICHAEL VENTON, INDIVIDUALLY AND ON BEHALF OF ALL THOSE ENTITLED TO RECOVER FOR THE WRONGFUL DEATH OF HATTIE VENTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2004 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT R. STEPHENSON |
| | L. CARL HAGWOOD |
| ATTORNEYS FOR APPELLEE: | MICHAEL M. WILLIAMS |
| | TYVESTER GOSS |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 09/13/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., DICKINSON AND LAMAR, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Hattie Venton was admitted to the Intensive Care Unit at Delta Regional Medical Center (DRMC) on January 7, 1999, after several fainting episodes. At the time, Venton was seventy-eight years old and suffered from multiple health problems such as anemia, gastrointestinal bleeding, hematuria, and atrial fibrillation. Approximately ten days after arriving at Delta Regional, Venton developed a decubitus ulcer (commonly referred to as a "bedsore") on her coccyx that ultimately expanded into a wound measuring six by ten inches.

On February 17, 1999, Venton was transferred from DRMC to HealthSouth, a Louisiana rehabilitation facility, where the bedsore began to heal. She died on March 30, 1999. The death certificate attributed the cause of death to respiratory failure, however, no autopsy was performed.

**PROCEEDINGS**

¶2. Charles Venton[1], Hattie Venton's son, brought a wrongful death claim against DRMC and ten unnamed staff members. Because DRMC was a community hospital existing under the laws of the State of Mississippi, this case proceeded as a bench trial pursuant to the Mississippi Tort Claims Act (MTCA) Mississippi Code Annotated section 11-46-1 et seq. (Rev. 2002). Upon completion of the trial proceedings, the trial judge found "by a preponderance of the evidence that negligent acts and/or omissions of the nursing staff and other employees and personnel of DRMC in failing to adequately turn and reposition Hattie Venton, and in failing to provide proper hydration, were proximate contributing causes of the skin breakdown, decubitus ulcer development, regression and the death of Hattie Venton."

¶3. As provided in Mississippi Code Annotated section 85-5-7 (Rev. 1999), fault was apportioned between the physicians, who were not parties to the lawsuit, and DRMC. Each was found to be fifty percent at fault. The court awarded Venton's estate $1,000,000 in damages, with $500,000 assessed against DRMC. This amount was reduced to $250,000

---

[1]During the pendency of this appeal, Charles Venton passed away, and Michael Venton was substituted as a party.

under the MTCA[2], but was again increased to $500,000, the amount of DRMC's insurance coverage.[3] DRMC contends that there was no proof of negligence on the part of its employees, no link between the degree of care and the development of bedsores, and no proximate causation between the ulcer and Venton's death.

### DISCUSSION

### I. Standard of Review

¶4.    The standard by which an appellate court reviews factual determinations made by a trial judge sitting without a jury is the substantial evidence standard. *Brewer Constr. Co. v. David Brewer, Inc.*, 940 So. 2d 921, 925 (Miss. 2006). Under such a standard, a lower court's findings will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence. *Donaldson v. Covington County*, 846 So. 2d 219, 222 (Miss. 2003). DRMC argues that we should depart from this deferential standard and instead conduct a de novo review because several of Venton's submitted findings of fact and

---

[2] Mississippi Code Annotated section 11-46-15(1)(b) (Rev. 2002) states:
In any claim or suit for damages against a governmental entity or its employee brought under the provisions of this chapter, the liability shall not exceed the following for all claims arising out of a single occurrence for all damages permitted under this chapter:
. . . (b) for claims or causes of action arising from acts or omissions occurring on or after July 1, 1997, but before July 1, 2001, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00).

[3] Mississippi Code Annotated section 11-46-17(4) (Rev. 2002) provides that:
Any governmental entity of the state may purchase liability insurance to cover claims in excess of the amounts provided for in Section 11-46-15 and may be sued by anyone in excess of the amounts provided for in Section 11-46-15 to the extent of such insurance carried; provided, however, that the immunity from suit above the amounts provided for in Section 11-46-15 shall be waived only to the extent of such excess liability insurance carried.

conclusions of law were adopted verbatim by the trial court. In reviewing the record, we note that findings of fact and conclusions of law were submitted by both parties and that the trial court's opinion contained some findings from each party in addition to the Court's own findings.

¶5. The authority cited by DRMC in support of its proposition, ***Mississippi Department of Transportation v. Johnson***, addressed the situation where findings of fact of *only one party* are adopted *in toto*. ***Johnson***, 873 So. 2d 108, 111 (Miss. 2004) (emphasis added). There, the opinion noted that:

> . . . proposed findings of fact and conclusions of law which Johnson's lawyer mailed to the judge are identical to the findings of fact and conclusions of law which the judge signed on November 12, 2002. There can be no doubt that the trial judge adopted and entered verbatim *Johnson's proposed findings of fact and conclusions of law*. The only difference is that in the version signed by the trial judge, he "filled in the blanks" for the percentages of fault . . . .

***Id.*** (emphasis added).

¶6. The situation above, where the trial judge adopted only one party's findings and conclusions, is clearly distinguishable from the case at bar. ***Johnson*** does not mandate de novo review where a court organizes facts from both sides along with its own additional findings.

¶7. It is no secret that courts in Mississippi deal with heavy caseloads and, unfortunately, many are understaffed. The practice of using both parties' submitted findings of fact and conclusions of law benefits judicial economy. This Court will not hinder practices that aid our court system when such actions are fair and just. We will therefore deviate from a

4

deferential standard only when, as precedence suggests, only *one party's* findings of fact are adopted *in toto*. *See* ***id.*** As this record reflects a collaboration of both parties' facts and conclusions, along with original determinations from the trial court itself, the substantial evidence standard will be applied.

## II. Sufficiency of the Evidence

¶8.     To establish a prima facie case of medical negligence, a plaintiff must prove that (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result. ***Burnham v. Tabb,*** 508 So. 2d 1072, 1074 (Miss. 1987). DRMC contends that Venton failed to prove the elements of breach and causation, thus it was entitled to a directed verdict.

## A. Breach

¶9.     The plaintiff presented two experts. The first was Dr. Roy Verdery, accepted by the court as an expert in the areas of internal medicine and geriatrics. He opined that DRMC and Venton's doctors breached the standard of care in their treatment of Venton in the areas of nutrition, medication, turning, documentation and wound care.[4]

---

[4]Specifically as to wound care, Dr. Verdery testified that it was a breach of care for Venton's doctors to prescribe peroxide and iodine treatments for Venton's decubitus ulcer. Stating that the prescribed treatments actually hinder the growth of new cells, Dr. Verdery opined that using a moist saline gauze dressing was the applicable standard of care in the medical community for treating bedsores. The trial court agreed with Dr. Verdery's uncontradicted testimony on this point and attributed fault to Venton's physicians, who were

¶10. Noting that nutrition is essential in the maintenance of skin integrity, especially in older people who are immobile, Dr. Verdery testified that Venton's malnutrition while at DRMC contributed to the development of her decubitus ulcer. In illustrating his point, Dr. Verdery pointed to the fact that Venton lost thirty pounds in the month that she was at DRMC. This extreme weight loss led to a loss of protein which, as Dr. Verdery testified, is integral in maintaining the skin's integrity. Although there were times when it was documented that Venton refused to eat, Dr. Verdery testified that nurses should have attempted to find more attractive food alternatives, such as ice cream. He also noted that certain antidepressants double as appetite stimulants, and said that the use of such medications has been within the standard of care in the geriatric community for many years although DRMC did not attempt to use them.

¶11. Dr. Verdery also testified to the standard of care in preventing decubitus ulcers by turning a patient. He noted that in order to prevent an ulcer from forming, a patient should be turned every two hours. Importantly, Dr. Verdery pointed out that turning a patient every two hours is not a "treatment" for people who have already formed decubitus ulcers, but that it is necessary to prevent an ulcer from forming in the first place. He noted that once an ulcer has formed, treatment must be "much more aggressive."

¶12. Loureen Downes, a registered nurse, testified as a nursing expert. Reiterating Dr. Verdery's testimony, Downes testified that the standard of care in prevention of bedsores

___

not parties to this suit, for any breach as to wound care.

mandates turning a patient at least every two hours. She pointed to medical records which showed that even after the pressure sore was diagnosed, Venton was not turned for periods ranging from three to upward of eight hours.[5]

¶13.    In addition to the standard of care for turning a patient, Downes testified to the standard of care in keeping a patient properly hydrated. She testified that the proper standard for hydration requires a patient to receive 2,000 to 3,000 ccs of fluid in a twenty-four-hour period. Proper hydration, according to Downes's testimony, insures that the skin receives nutrients through the circulatory system. Without proper hydration, the skin does not receive these essential nutrients, and the risk of breakdown is increased. Downes pointed to medical records which revealed that Venton's fluid intake as controlled by the staff of DRMC was far less than what was prescribed by her doctors, and grossly inadequate to meet her hydration needs.

¶14.    DRMC asks this Court to disregard the plaintiff's expert testimony, arguing that the bulk of Dr. Verdery's and Downes's conclusions were unsupported and contradictory to the records. While Dr. Verdery did admit that only a physician could have ordered the pain medication, nutritional supplements, and special pressure-relieving bed that Venton required, the trial court allocated fault in these particular areas to the physicians, not DRMC, in its findings of fact. The trial court's opinion was that DRMC's liability was entirely based upon the failure to turn Venton and provide her with proper hydration.

_____

[5]One such medical record revealed that Venton remained in one position for sixteen hours on January 20, 1999, after which her decubitus ulcer regressed to Stage III.

7

¶15.    As noted above, this Court will not disturb the findings of a trial judge sitting without a jury unless such findings were manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Chantey Music Publ., Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1055 (Miss. 2005). Based upon the evidence discussed above, we find that the element of breach was sufficiently established. This issue is without merit.

### B. Causation

¶16.    DRMC's next contention of error is that causation was not properly established by the plaintiff at trial. As to the development of the pressure sore, Dr. Verdery testified that the wound was a result of lack of proper hydration, nutrition, and turning on behalf of DRMC employees.

¶17.    As to the cause of death, Dr. Verdery asserted that Venton died of sepsis from the decubitus ulcer. Basing his opinion on the medical records, he pointed to blood tests performed at HealthSouth rehabilitation facility that revealed *bacteroides fragilis* bacteria in Venton's bloodstream. Dr. Verdery stated that this bacteria is "very uncommonly found in people unless they have an anaerobic infection, an infection which is very difficult for air to get to, such as a decubitus ulcer or an infected bone at the bottom of a decubitus ulcer."

¶18.    After a brief explanation about the location of the bedsore and that location's effect on treatment, Dr. Verdery was asked to correlate the bacteria and Venton's death. He testified that: "this constant infection in this large decubitus ulcer causes inflammatory reaction in the rest of the body. The liver begins to stop functioning, the heart doesn't pump very well, the lungs don't maintain their integrity and fill up with fluids . . . [a]fter the other

8

organs fail, death ensues." It was Dr. Verdery's opinion, to a reasonable degree of medical probability, that the bedsore caused Venton's death.

¶19. The defense put on Dr. Calvin Ramsey as its medical expert. Dr. Ramsey disagreed with Dr. Verdery's assessment and stated that in his opinion "Mrs. Venton died, according to the death certificate, of a respiratory problem. On the death certificate there is no mention made of anything about infection, or a decubitus more specifically."

¶20. When there is a conflict of expert medical opinion, this Court has held it to be within the province of the fact-finder to determine the cause of death. *See Cowan v. State*, 399 So. 2d 1346, 1348 (Miss. 1981); *Thompson v. State*, 70 So. 2d 341 (Miss. 1954). Rarely is there a case in which all experts agree on all issues. Substantial and credible evidence was presented on both sides; it was the trial judge's responsibility to determine which expert was the most reliable. We find this issue to be without merit.

### III. Damages

¶21. DRMC asks this Court to reduce the amount of damages, arguing that the $1,000,000 judgment was excessive and against the overwhelming weight of the evidence. Our case law holds that for a defendant to be entitled to a reduction, such damages "must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption." *United States Fid. & Guar. Co. v. Estate of Francis*, 825 So. 2d 38, 47 (Miss. 2002). The award is not to be set aside unless it is entirely disproportionate to the injury sustained. *Gatewood v. Sampson*, 812 So. 2d 212, 222 (Miss. 2002)(citing *Illinois*

9

*Central R.R. v. Gandy*, 750 So. 2d 527, 534 (Miss. 1999)).  Compensation in a wrongful death action is not limited to actual damages and lost wages, but extends to the pain and suffering of the deceased, as well as the loss of companionship and society.  *Thomas v. Hilburn*, 654 So. 2d 898, 903 (Miss. 1995).

¶22.    While in the care of DRMC, Venton developed a bedsore measuring six by ten inches in diameter.  The Court found that by the time Venton left DRMC on February 17, 1999, the ulcer was large enough that a volleyball could be placed inside it.  Although both parties agreed that the standard of care mandates turning a patient every two hours, the medical records show that Delta Regional failed to meet this benchmark during the majority of Venton's stay, even after she first developed a skin tear.  In the medical records, a nurse changing Venton's dressing described "picking out little pieces of bone from the dressing as it was removed from her backside."

¶23.    Testimony revealed that Venton experienced substantial pain and suffering from the time she entered the facility until her death.  Comparing amounts deemed suitable in other negligence cases, an award of $1,000,000 is not outrageous.  *See Purdon v. Locke,* 807 So. 2d 373 (Miss. 2001) (upholding award for $450,000 for medical negligence resulting in severe soreness and discomfort); *Holmes County Bank & Trust Co. v. Staple Cotton Cooperative Ass'n.*, 495 So. 2d 447 (Miss. 1986)(reinstating jury verdict of $200,000 where seventy-five-year-old plaintiff incurred neck injuries).  DRMC presented no evidence showing  that the trial judge was influenced by passion, partiality, prejudice or corruption, therefore, this issue is without merit.

10

## IV. Conclusion

¶24.    For the foregoing reasons, the judgment of the lower court is affirmed.

¶25.    **AFFIRMED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH,  JJ., CONCUR.**